1  STEVE M. DEFILIPPIS, ESQ.
2  State Bar #117292
   PICONE & DEFILIPPIS, APLC
3  625 North First Street
   San Jose, CA 95112
4  (408) 292-0441

5  Attorneys for Petitioner,
   EDMUND ASBURY

6

7

ORIGINAL
FILED

AUG - 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

*IN THE UNITED STATES DISTRICT COURT*

8  *NORTHERN DISTRICT OF CALIFORNIA*

9

10  In re

11      EDMUND ASBURY,

12          Petitioner,

13              vs

14      BEN CURRY, Warden

15          Respondent

16      On Habeas Corpus.

17

18  ────────────────────────

19  BOARD OF PRISON TERMS,
    ARNOLD SCHWARZENEGGER,
20  Governor,

21      Real Parties in Interest.

22  ────────────────────────

Case No. **C08-1946SBA**

[Cal. Supreme Ct. S160777; Ct. of Appeal
Case # B203323
Commitment Offense: Los Angeles Co.
Sup. Ct., Case #A142680]

***POINTS AND AUTHORITIES IN
SUPPORT OF PETITION FOR
WRIT OF HABEAS CORPUS***

23

24                    ***STATEMENT OF THE FACTS***

25  *A. The Circumstances of the Offense*

26      In order to understand what led up to the commitment offense, it is important to have a

27  full understanding of Mr. Asbury's history. Additionally, in demonstrating why Mr. Asbury is

28  presently suitable for parole it is imperative to not just look at his past, but to compare the person

he was growing up and at the time of the offense, to the person he has become today. *Greenholtz*

1

TABLE OF CONTENTS...................................................................................i

TABLE OF AUTHORITIES.........................................................................iii

STATEMENT OF THE FACTS......................................................................1

A. The Circumstances of the Offense...........................................................1

    1. Social History.................................................................................2

    2. Prior Criminal Record ..................................................................2

    3. Current Offense..............................................................................3

B. Prior Parole Suitability Hearings .............................................................4

C. Recent CDC Expert Evaluations...............................................................9

    1. Psychological Evaluation, July 2004...........................................10

    a. Programs and Treatment..............................................................10

    b. Assessment of Dangerousness.....................................................11

    2. Psychological Evaluation, February 2005...................................11

D. Advances Made During Incarceration......................................................12

    1. Education.......................................................................................12

    2. Work/Vocational Training............................................................12

    3. Self-Help Programs.......................................................................13

    4. Disciplinary Record......................................................................14

    5. Parole Plans..................................................................................15

E. Current Parole Suitability Hearing, January 5, 2005..............................17

LEGAL ARGUMENT.................................................................................21

    I.      HABEAS CORPUS IS THE PROPER REMEDY BY WHICH TO
           TEST THE PROPRIETY OF A DENIAL OF PAROLE BY THE
           BOARD..................................................................21

      A. PETITIONER HAS A FEDERALLY PROTECTED LIBERTY INTEREST
          IN PAROLE.........................................................23

    II.    THE STATE COURT'S DETERMINATION WAS BOTH
          UNREASONABLE AND WRONG.................................24

III.   CONTINUED RELIANCE ON THE COMMITMENT OFFENSE VIOLATES DUE PROCESS; THE IMMUTABLE FACTS OF THE CRIME NO LONGER HAVE PREDICTIVE VALUE AS TO PETITIONER'S CURRENT THREAT TO SOCIETY..................25

    A.  THE FOCUS IS ON CURRENT DANGEROUSNESS................25

    B.  THE COMMITMENT OFFENSE IS A FACTOR THAT IS <u>INTIALLY</u> PERMITTED BY STATUTE AND THE REGULATIONS TO MEASURE WHETHER PETITIONER PRESENTS A CURRENT THREAT TO THE COMMUNITY; AFTER A PERIOD OF TIME, IT LOOSES ALL PREDICTIVE VALUE...................29

    C.  AFTER TWENTY EIGHT YEARS OF INCARCERATION AND POSITIVE PROGRAMMING, THE COMMITMENT OFFENSE NO LONGER HAS PREDICTIVE VALUE AS TO MR. ASBURY'S' CURRENT DANGEROUSNESS..........30

3. Summary...............................................................41

IV.   THE BOARD ABUSED ITS DISCRETION WHEN IT FOUND PETITIONER WOULD POSE AN UNREASONABLE RISK OF DANGER TO SOCIETY IF RELEASED WHEN BY THE BOARD'S OWN RULES THAT FINDING WAS NOT SUPPORTED BY THE EVIDENCE................................42

V.   THE BOARD'S RULING IS CONTRARY TO CLEARLY ESTABLISHED SUPREME COURT LAW AS IT RELIES ON UNCONSTITIONALLY VAGUE LANGUAGE. ...........................57

VI.   THE FAILURE OF THE PROSECUTION TO REQUEST THAT THE TRIAL COURT MAKE SPECIAL FINDING REGARDING THE ASPECTS OF THE CRIME PRECLUDES THOSE FINDINGS FROM NOW BEING USED TO JUSTIFY DEPARTING FROM THE "SHALL NORMALLY" FORMULATION OF PENAL CODE §3041.......................61

CONCLUSION......................................................................65

1

Federal Cases

Apprendi v. New Jersey  530 U.S. 466 (2000)                                          56, 66

Biggs v. Terhune, 334 F.3d 910, 915-16 (9th Cir. 2003)                               passim

Biggs, supra, 334 F.3c at 317                                                        28, 36, 42, 48

Blakely v. Washington 592 U.S. 296 (2004)                                            9

Blakely v. Washington, supra, 542 U.S. 296                                           56, 66, 67, 68

Board of Pardons v. Allen, 482 U.S. 369 (1987)                                       27, 28, 33

Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist., 149 F.3d 971, 982            27

Brown v. Kane ___ F.Supp.2nd ___ [2007 WL 1288448]                                   30, 38

Brown v. Poole, 337 F.3d 1155 (9th Cir. 2003)                                        69

Cunningham v. California, --U.S.--, 127 S.Ct. 856 (2007)                             66

Cunningham, supra, ___ U.S. ___, 127 S.Ct. at 860                                    68

Ellis v. District of Columbia, 84 F.3d 1413                                          28

Godfrey v. State of Georgia  446 U.S. 420 (1980)                                     65

Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, at 9 (1979)         6, 27, 28, 33

Gurley v Rhoden, 421 U.S. 200, 208 (1975)                                            26

Hill, supra, 472 U.S. 445                                                            35, 36

Irons v. Carey [Irons II], 476 F.3d 658 (9th Cir. 2007)                              37, 38, 45

Johnson v. Finn, 2006 WL 195159, (E.D. Cal. 2006)                                    44, 45

Jones v. Smith, 231 F.3d 1227 (9th Cir. 2001)                                        66

LaJoie v. Thompson, 217 F.3d 663                                                     26

Little v. Hadden, 504 F.Supp. 558 (1980)                                             50, 53, 61

Lockyer v. Andrade, 538 U.S. 63 (2003)                                               25

Maynard v. Cartwright, 486 U.S. 356 (1989)                                           65

McQuillion I, supra, 306 F.3d 895                                                    34, 49

McQuillion v. Duncan, 306 F.3d 896, 900 (2003)                                       27, 28, 47, 49

Michael v. Ghee, 498 F.3d 372, 378                                                   28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mullaney v. Wilbur, 421 U.S. 684, 691 (1975)                                           26

Peltier v. Wright, 15 F.3d 860, 862                                                    26

Rosenkrantz VI] 444 F.Supp.2d 1063, at 1085 (C.D. Cal. 2006)                           passim

Sanchez v. Kane  444 F.Supp.2d 1049 (C.D. Cal. 2006)                                   30, 32, 38, 41

Sass v. Board of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006)                     28, 30, 37, 38

Schwartzmiller v. Gardner (9th Cir. 1984) 752 F.2d 1341, 1346                          63

Shell v. Mississippi, 498 U.S. 1, 3 (1990)                                             65

Stirone v. United States, 361 U.S. 212, 218 (1960)                                     66

Taylor v. Maddox, 366 F.3d 992, 1000-1 (9th Cir. 2004)                                 26, 29

Thomas v. Brown, ___F.Supp.___ [2006 WL 3783555] *3 (N.D. Cal. 2006)                   30, 40

Thompson v. Davis, 282 F.3d 780 (9th Cir. 2002)                                        55

United States v. Doremus, 888 F.2d 630, 634 (9th Cir. 1989)                            63

United States v. Guagliardo, 278 F.3d 868, 872 (9th Cir. 2002)                         25

Williams v. Rhoades, 354 F.3d 1101, 1106                                               26

Williams v. Taylor, 529 U.S. 362 (2000)                                                25

Wisconsin v. Mitchell, 113 S.Ct. 2194, 2199 (1993)                                     26

Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991)                                        26

State Cases

In re Barker, 151  Cal.App.4th, 346, 365 (2008)                                        30, 38

In re Dannenberg I, supra, 34 Cal. 4th 1061                                            passim

In re Elkins, supra 144 Cal.App.4th 499                                                32

In re Ghirardo v. Antonioli, 8 Cal.4th 791, 800 (1994)                                 69

In re Elkins 144 Cal.App.4th 475, 499, 521 (2006)                                      30, 32, 38, 39

In re Ernest Smith, 114 Cal. App. 4th 343 (2003)                                       36, 49, 51, 63

In re Gray 151 Cal.App.4th 379, (2007)                                                 38

In re Hogan, 187 Cal.App.3d 819, 824 (1986)                                            69

In re Lee 143 Cal.App.4th 1400, 1408-1409 (2006)                                       30, 32, 39

In re Mark Smith 109 Cal.App.4th 489, at 509-505 (2003)     32, 49, 63

In re Morrall, supra, 102 Cal.App.4th 280     49

In re Ramirez, supra, 94 Cal.App.4th 549     passim

In re Roberts, 36 Cal. 4th 575, at 589-590 (2005)     68, 69

In re Rodriguez, (1975) 14 Cal.3d 639 (1975)     48, 49

In re Scott, 119 Cal.App.4th 871, 892 (2004)     53

In re Sena, 94 Cal.App.4th 836, at 839 (2002)     69

In re Van Houten, 116 Cal.App.4th 339 (2004)     50, 53, 63

In re Weider, 45 Cal.App.4th 570, 589 (2006)     30

People v. Black, 35 Cal.4th 1238 (2005)     68

Rosenkrantz II, supra, 80 Cal. App.4th 409     passim

Rosenkrantz V, supra, 29 Cal. 4th 616     passim

In re Scott II, supra, 133 Cal. App. 4th 573     passim

Superior Court of Santa Clara County v. Engert, 31 Cal.3d 797, 805 (1982)     65

Federal Statutes

28 U.S.C. § 2254(a)     25

28 U.S.C. § 2254(d)     25

28 U.S.C. § 2254(d)(2)     26, 29

28 U.S.C. §2254     45

Americans with Disabilities Act (42 U.S.C.A. § 12102(2)     55

Penal Code § 3041     28

Penal Code § 3041(a)     64

Penal Code §3041(b)     7

Penal Code section 3041(a)     9, 10, 11

State Regulations

Cal. Code Regs. § 2402(c)(3)                                          54

Cal. Code Regs. §§ 2402(d)(1)                                        56

Cal. Code Regs. tit. 15 § 2402                                       34

Cal. Code Regs. tit. 15 § 2402(a)                                    34

Cal. Code Regs. tit. 15 § 2402(c)(1)                                 34

Cal. Code Regs. tit. 15 §2402(a)                                     50

Cal. Code Regs. tit. 15 §2402(c)(1)                                  51

Cal. Code Regs. tit. 15 §2402(c)(3)                                  51

Cal. Code Regs. tit. 15 §2403(d)                                      9

Cal. Pen. Code § 3041                                                33

Cal. Pen. Code § 3041(a)                                             34

Cal. Pen. Code § 3041(b)                                             33

Pen. Code §3041                                                      68

Pen. Code §3041(b)                                                   68

Other Authorities

Ct. of Appeal Case # B203323                                          5

*v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, at 9-10 (1979) [a decision to parole an inmate turns on an "assessment of a multiplicity of imponderables, entailing primarily what a man is and what he may become *rather than simply what he has done*"], emphasis added.) This information has been summarized thoroughly in the Life Prisoner Evaluation Reports of December 2003, May 2001, and February 1999. Appendix Exh. A, pp. 9-10, 18-26, 75-80) and the Psychological Evaluations of Dr. Joe Reed, Ph.D., Exh. C, pp. 338-343.[1]

### 1. Social History

Mr. Asbury, born December 25, 1950, suffered a difficult childhood filled with tragedy. He is the third of nine children born to Douglas and Aretta Asbury. His early relationship with his father was warm and supportive. However, his father died as the result of an automobile accident in 1962. Mr. Asbury continued living with his mother, but was effectively raised by his older sister due to the fact that his mother was often isolated in her room, drinking alcohol. His mother was subsequently killed in a hit and run accident in 1966. At that point, Mr. Asbury was placed in foster care. Mr. Asbury passed through a series of foster homes until he was placed in reform school following his juvenile offense. See Exh. A, p. 83. After the death of his mother, due to these placements, Mr. Asbury lost contact with all of his siblings.

Mr. Asbury has been married three times.[2] His first marriage was in 1972 to Katherine Moen. Two children were born of this union. In 1975 he married Maria Jackson. They then separated in 1982. Mr. Asbury remarried that same year to Jane Harrier, and the two remain married to this day. Throughout Mr. Asbury's numerous psychological evaluations, CDC experts consistently note the warm and supportive nature of Mr. and Mrs. Asbury's relationship as well as the fact that when released Mr. Asbury has a home waiting for him in Alameda county where his wife resides and is employed.

### 2. Prior Criminal Record

Although Mr. Asbury has a criminal record, it must be stressed that he does not have a history of violence. His juvenile record shows one arrest and disposition for driving a vehicle without the owner's consent. This incident occurred when Mr. Asbury was eleven (11) years old. The Board states that between the ages of eleven and eighteen Mr. Asbury was arrested

---

[1] Unless otherwise indicated, the Statement of Facts is drawn from the Life Prisoner Evaluation reports of December 2003, May 2001, and February 1999 Exh. A, pp. 9-10, 18-26, 75-80), the Psychological Evaluations of Dr. Joe Reed, Ph.D. Exh. C, pp. 338-343, and the transcript from the Board hearing Exh. B.

[2] This information regarding the dates and names of Mr. Asbury's spouses is drawn from the 1996 Life Prisoner Evaluation Report. Exh. A p. 40.

five (5) times for grand theft of an automobile and driving without the owners consent. Exh. B p. 289. However, those charges were all dropped because they were without merit. Exh. B pp. 289-290.[3]

In his mid-teens Mr. Asbury began to experiment with drugs. As his substance and alcohol abuse increased, Mr. Asbury's judgment and life deteriorated. In his 1994 Psychiatric Evaluation, Dr. O'Meara documented that Mr. Asbury's criminal activity "was evidently fueled by escalating alcohol abuse." Exh. A p. 83. At the peak of his alcohol abuse Mr. Asbury reports drinking up to a gallon of vodka a day in addition to a case of beer. His entire adult record evidences the effect that his alcohol abuse had upon his judgment. Mr. Asbury's numerous arrests, primarily for Driving under the Influence, document the history of an individual suffering from addiction. However, nothing, even at the height of his alcohol abuse, demonstrates that Mr. Asbury had, or has, violent tendencies. The 2003 Life Prisoner Evaluation Report documents that although Mr. Asbury has a criminal record, it includes no incidents of "willful violence" and this speaks strongly towards non-reoccurrence. Exh. A p. 11. This, in addition to all subsequent psychological evaluations, demonstrates that Mr. Asbury's actions on the date of the instant offense were wholly the result of his alcohol inebriation. In response to a § 3042 for Mr. Asbury's Initial Parole Consideration Hearing, the trial Judge, Judge Darlene Schempp, wrote to the Board stating, "This violent conduct was the result of an alcoholic episode. When not under the influence of alcohol, Mr. Asbury no doubt could be a responsible citizen." Exh. H, p. 366.

### 3. Current Offense

On May 21, 1979, Mr. Asbury had been drinking heavily at a bar a short distance from the scene of the incident. All reports document his behavior as having been wild and obnoxious. In fact, his behavior was apparently so uproarious that Mr. Asbury was asked to leave the bar. At some point later in the evening, Mr. Asbury returned to the aforementioned bar and borrowed a pick-up truck. Mr. Asbury was arrested at approximately 2:00a.m., less than an hour prior to the discovery of Mr. Jackson's body, while driving that borrowed vehicle. In the vehicle, the police discovered Mr. Jackson's keys and billfold. After his arrest it was noted that Mr. Asbury's clothing had blood on it, later determined to be of the same type as the victim. When tested at approximately 3:40a.m. Mr. Asbury had a blood alcohol level of .14 percent.

---

[3] Under the mandates of *Penal Code* §3041, the Board is not permitted to consider any charges which did not result in a juvenile disposition or adult conviction. See *Penal Code* §3041(b) ["...the Board...shall set a release date

On the night of the incident, Mr. Jackson had been out drinking at the Captain's Chair Lounge, a bar in Van Nuys, California. It is believed that Mr. Jackson was in his car, sleeping off his own alcohol consumption, when the events that gave rise to his death commenced. Mr. Asbury has no clear memory of the circumstances of that evening, due to his heavy alcohol consumption, and states that what he knows about the offense is derived from what the police told him. Mr. Jackson's body was located at approximately 3:00a.m. in a parking lot adjacent to the Captain's Chair Lounge. When discovered his pockets were turned inside-out and no personal property was found on his person or in the area surrounding his body. Mr. Jackson died due to blows to his head, believed to have been caused by the four by four inch board located at the scene.

Clearly, such behavior was completely uncharacteristic of Mr. Asbury as his record shows no history of violent behavior. As mentioned above, Mr. Asbury's 2003 Life Prisoner Evaluation report states his "criminal history was colorful to say the least, however, there were no incidents of willful violence involved." Exh. A p. 12. Mr. Asbury accepts complete responsibility for the death of Mr. Jackson. From the time of his trial Mr. Asbury has exuded remorse. As stated above, the judge who conducted Mr. Asbury's trial, the Honorable Darlene Schempp, Judge of the Los Angeles County Superior Court, submitted the following comment to the Board for Mr. Asbury's January, 1989 hearing:

> "Mr. Asbury was a very courteous and seemingly remorseful defendant during the murder trial in my court. This violent conduct was the result of an alcoholic episode. When not under the influence of alcohol, Mr. Asbury no doubt could be a responsible citizen." See Exh. H, p. 366.

In the report prepared for his initial parole consideration hearing in 1989, Mr. Asbury was quoted stating: "I'm sorry that the man is dead, I'm sorry for his family..." See Exh. A p. 19. Each and every evaluation and report prepared subsequently documents Mr. Asbury's remorse over the death of Mr. Jackson. Mr. Jackson's death was the tragic apex of years of alcohol abuse, and it forced Mr. Asbury to truly acknowledge the devastating effects of his alcoholism. Mr. Asbury now appreciates that while under the influence of alcohol he is not in control of his capacities. While certainly his alcoholism is no excuse for Mr. Jackson's death, Mr. Asbury's history of alcohol abuse does serve as an explanation as to why his behavior on the date of this incident so markedly differed from his otherwise nonviolent demeanor.

**B. Prior Parole Suitability Hearings**

4

Petitioner has been through seven (7) prior parole suitability hearings. These prior hearings demonstrate how the Board's procedure and approach towards these hearings is arbitrary and nothing more than a sham.

### 1. Initial Parole Suitability Hearing, January 17, 1989.

Mr. Asbury was received by the California Department of Corrections (CDC) on June 13, 1984 where his Minimum Term was calculated to be February 1, 1990. Pursuant to *Penal Code* section 3041(a), Mr. Asbury's initial parole hearing was held on January 17, 1989.[4] At that hearing the Board denied Mr. Asbury for two (2) years. The grounds for denial were the Board's findings that the "offense was carried out in an especially heinous, atrocious, and cruel manner which exhibits a callous disregard for human life and suffering. The victim was mutilated during the offense." Exh. A p. 164.[5] As grounds for denial, the Board also noted Mr. Asbury's prior criminal record, institutional behavior, and found the psychiatric report to be unfavorable. In the decision the Board made three recommendations: 1) Mr. Asbury become discipline free, 2) Participate in self-help and therapy programming, and 3) Continue self-help and therapy for insight and AA or other substance abuse programs. *Id.* pp. 161-168.

### 2. Second Parole Suitability Hearing, January 23, 1991.

Mr. Asbury's second parole suitability hearing was held January 23, 1991. At that hearing Mr. Asbury was denied parole for one (1) year based upon the Board's findings that the commitment offense was "carried out in an especially heinous and atrocious manner exhibiting a callous disregard for the life or suffering of another," his prior record, and current institutional behavior. Exh. A pp. 155-158. At that time the Board made three (3) recommendations: 1) Mr. Asbury remain discipline free, 2) Upgrade educationally, and 3) Participate in self-help programming to deal with substance abuse and self-esteem. *Id.*

### 3. Third Parole Suitability Hearing, January 30, 1992.

Mr. Asbury's third parole suitability hearing was held on January 30, 1992. At that

---

[4] *Penal Code* §3041(a) requires that the initial parole suitability hearing be held one (1) year before the inmate completes his minimum term.

[5] Although Petitioner is not contesting the validity of this parole hearing, he requests the Court recognize that the Board is precluded from making findings that take the case outside the normal sentencing structure for the circumstances proven or admitted for the individual case, as prescribed here by the matrix *Cal. Code Regs.* tit. 15 §2403(d)), when those facts have not been charged and found true by the trier of fact at the time of the conviction. *Blakely v. Washington* 592 U.S. 296 (2004). For example, the Board is precluded by the Constitution from punishing Mr. Asbury as if he was convicted of first degree murder when he stands convicted of the lesser crime of second degree murder. Yet the Board routinely ignores this rule, as they did here in finding that the "offense was carried out in an especially heinous, atrocious, and cruel manner which exhibits a callous disregard for human life and suffering. The victim was mutilated during the offense."

hearing Mr. Asbury was denied parole for two (2) years. This denial was based upon the Board's findings that the commitment offense was, "carried out in an especially heinous, atrocious, cruel, dispassionate and calculated manner which exhibits a callous disregard for the life and suffering of another," that "the victim was abused and mutilated during the offense," his prior record, and institutional behavior including four disciplinary violations during the prior year. Exh. A pp. 147-148, 151. At this hearing the Board commended Mr. Asbury on upgrading educationally and vocationally finding, however, that those positive aspects of his behavior did not outweigh the factors of unsuitability. *Id.* at 150. At this hearing the Board again made three recommendations: 1) Mr. Asbury become and remain disciplinary free, 2) Upgrade vocationally to the completion of certifications, and 3) Continue to participate in self-help such as Alcoholics Anonymous, Narcotics Anonymous, and therapy programming.

### 4. Fourth Parole Suitability Hearing, January 13, 1994.

Mr. Asbury's fourth parole suitability hearing was held on January 13, 1994, and again he was denied for two (2) years. The Board's justifications for this denial were, again, that the offense was committed in "an especially atrocious and cruel manner," Mr. Asbury's prior criminal record, his disciplinary violation on February, 13, 1993, Dr. Omera's psychological report, and that he had not completed the necessary programming. Exh. A p. 142. The Board again made similar recommendations regarding participation in Alcoholic Anonymous and remaining disciplinary free.

### 5. Fifth Parole Suitability Hearing, April 17, 1996

Mr. Asbury's fifth parole suitability hearing was held April 16, 1996.[6] At that hearing he was denied parole for three (3) years. Yet again, the Board's primary basis for denial was the commitment offense itself. The Board stated that, "the offense was carried out in an especially cruel and callous manner with a disregard for the life and suffering of another, in a dispassionate manner" and "the victim was mutilated during the offense." [7] Exh. A p. 132. The Board

---

[6] Petitioner requests this Court take notice that his fifth parole suitability hearing was three (3) months late.

[7] The actual regulatory language of *Cal. Code Regs.*, tit. 15 § 2402(c)(1)(E) states "[t]he offense was carried out in a dispassionate and calculated manner, such as an execution style murder. This phrase is a term of art in CDC, as the prisons have to implement Board regulations that use this identical terminology in the housing of inmates who have committed murders. *Cal. Code Regs.*, tit. 15, §3375.2(a)(7)(A). A CDC memorandum defines it as "those crimes wherein the victim was shot in the head after being bound or cuffed, made to kneel, made to lie down, or made to face a wall." See Exh. L, attached hereto. No such facts were proven in the instant case. The use of this terminology to deny Mr. Asbury parole further demonstrates how the Board makes independent factual findings, impermissible under *Apprendi/Blakely*, has treated Mr. Asbury as though he had been convicted of first degree murder, and therefore has violated his right to due process under *Penal Code* §3041.

6

additionally relied on Mr. Asbury's prior non-violent criminal record and stated he had not sufficiently participated in self-help and therapy programming. *Id.* at 133.    The Board commended Mr. Asbury on remaining disciplinary-free since 1993, his several laudatory chronos from his supervisors, upgrading educationally and completing vocational small engine repair.[8] *Id.* However, finding that these positive aspects did not outweigh the factors of unsuitability, Mr. Asbury was denied a parole date. As in prior years, the Board made the identical three recommendations regarding discipline, upgrading vocationally and educationally (despite his having already done so), and participating in self-help programs. *Id.* at 134.

### 6. Sixth Parole Suitability Hearing, May 20, 1999.

Mr. Asbury's sixth parole suitability hearing was held on May 20, 1999. At that hearing he was denied parole for two years. This Board panel also focused on the commitment offense stating, "The offense was carried out in an especially callous manner with a disregard for the life of another one, another person." Exh. A p. 124. Additionally, the Board held that Mr. Asbury had not sufficiently participated in self-programming. One unique aspect of this hearing was that despite the Board's finding that "in general the psych report was positive on behalf of the prisoner," the Board's stated that the psychiatric reports did Mr. Asbury a disservice by not "delving to any great depth into this prisoner's prior criminality and the life crime." Exh. A pp. 124-125. What the Board meant by this is a mystery, as their statements are incomprehensible in the face of what is clearly a favorable report that negates any finding of current dangerousness, further evidencing the capricious nature of these hearings. Mr. Asbury was again commended for his advancements. His accomplishments noted at this hearing included completing the vocational small engine repair program, getting his GED, receiving satisfactory grades, remaining disciplinary-free since 1993, and participating as a dental assistant.[9] Exh. A pp. 125-126. The Board's recommendations at this hearing echo those of the five (5) prior hearing in suggesting that Mr. Asbury remain disciplinary-free and participate in self-help and therapy.

### 7. Seventh Parole Suitability Hearing, December 17, 2001.

Mr. Asbury's seventh parole suitability hearing was held on December 17, 2001. Mr. Asbury was again denied parole, this time for two years. As in all six (6) prior hearings, the

---

[8] Petitioner requests that this Court take notice of the fact that as recommended by the 1992 Board Panel, Mr. Asbury completed and received a vocational certificate, and as recommended by all prior Board Panels, had remained disciplinary-free since 1993.

[9] As noted above, these accomplishments fulfill the requirements set forth by prior Board Panel's with regard to what Mr. Asbury needed to accomplish in order to be suitable for parole.

Board focused on the commitment offense itself, this time describing it as having been carried out in a "very violent and brutal manner." Exh. A p. 105. This Board Panel also commented upon Mr. Asbury's prior criminal record, participation in therapy, and the erroneous belief that he "hadn't completed a vocation."[10] Exh. A p. 103. The Board commended Mr. Asbury on remaining disciplinary-free since 1993, his acceptable work reports, being involved in the Vocational Computer Repair program, and his self-study of the 12-steps from Alcoholics Anonymous. At this hearing the Board also noted that, were Mr. Asbury to be released, he had a wife, home, and job offer waiting for him in Alameda County.[11]  Despite these numerous accolades, this Board denied parole, again enumerating the identical three recommendations that: 1) Mr. Asbury remain disciplinary-free, 2) Upgrade vocationally, and 3) Participate in self-help and therapy programs, all of which he had consistently been successful in doing for the last decade. Exh. A p. 106. The lack of a good faith basis for these recommendations is shown by the clear evidence that Mr. Asbury had been disciplinary free for the last decade, had already completed one vocation and started another, has remained free of alcohol and drugs for over two (2) decades, and had steadily participate in self-help programming when available.

### 8. Absence of Parole Suitability Hearing in 2003.

Although the 2001 Parole Suitability Denial was for two (2) years, Mr. Asbury did not receive a 2003 hearing. Nothing more clearly demonstrates the arbitrariness of these hearings more succinctly than the Board's blatant failure to even provide a hearing in 2003.

Mr. Asbury's 2003 Life Prisoner Evaluation Report prepared in anticipation of a parole suitability hearing evidences Mr. Asbury's numerous successes. Exh. A pp. 9-11. The report documents how Mr. Asbury has programmed successfully at Medium "A" custody level since March 1989, he has a classification score of "0" points for behavior, and was assigned to the vocational Computer Repair program as a teacher's aide until the program was suspended in September 2003. (Id.)  Additionally, the report documents that Mr. Asbury continued his Alcoholics Anonymous and Narcotics Anonymous participation during the period of evaluation, and had received no disciplinary violations. Id.   The overall report was very positive.

---

[10] As previously noted, he did complete a vocation when he received his certificate in small engine repair. This was even acknowledged by the prior Board Panel during his sixth parole suitability hearing in 1999.
[11] These are precisely the favorable factors the Board is required to consider, as set forth in the "Circumstances Tending to Show Suitability" in Cal. Code Regs., tit. 15 §2402(d).

Particularly noteworthy is the author's summary which states:

> Between the POR statements and the arrests records, his prior criminal history was colorful to say the least, however, there were no incidents of willful violence involved. I mention it because as a barometer for any inclination towards recidivistic behavior concerning a violent crime, it would speak favorable for non reoccurrence....[Mr. Asbury] has expressed remorse for his actions and is continually haunted with the ensuing adverse ramifications his role has had on all those affected throughout the years. Asbury realizes he cannot change the past and in accepting responsibility, makes no excuses or tries to shift any blame. He knows alcohol abuse is a causative factor and is in a consistent effort to correct this aspect through his self-help participation.... Although his early incarceration behavior was a little on the rocky side, he abruptly ceased his tumultuous run and has not had any disciplinaries since 1993. He seems more settled and focused on a positive path now. He has had many years to reflect and put things in perspective. As long as he has his current support structure and refrains from any association with alcohol, he should be able to achieve success upon release. Exh. A p. 11.

Had Mr. Asbury received the parole suitability hearing to which he was entitled in 2003, the Board would have been without any evidence, other than the immutable facts of the crime itself, to support a finding that Mr. Asbury currently posed a danger to the public as required under *Penal Code* §3041 to deny the grant of a parole date.

## C. Recent CDC Expert Evaluations[12]

Prior to each parole suitability hearing, Mr. Asbury has been evaluated by both Department of Corrections' custody and psychological staff. At each parole suitability hearing, the issue before the Board is the prisoner's "current" dangerousness. To assist the Board in determining suitability, psychological evaluations, including an "Assessment of Dangerousness" (i.e. violence potential), are required by the Department of Corrections Operating Manual (DOM) §62090.13.[13] These evaluations are essential to an informed decision by the Board regarding the setting of a release date. Mr. Asbury has received a CDC Psychological Evaluations almost annually since 1985. Over the years, his CDC evaluations demonstrate the

---

[12] This section focuses on the various reports generated subsequent to his December 2003 Life Prisoner Evaluation Report, already discussed *supra*. These reports document CDC's own expert's most current conclusions that Mr. Asbury's violence potential is no greater than the average citizen. These reports demonstrate that the Board cannot reasonably find that Mr. Asbury "currently" poses an unreasonable threat of future danger to society as necessary to deny setting a parole date under *Penal Code* §3041.

[13] DOM §62090.13, "Psychiatric Conclusions, Parole and Release," calls for the doctor to choose "less than average, average, or greater than average" violence potential. "[A]verage violence potential is interpreted to mean the violence potential possessed by the average inmate."

9

dramatic changes he has effected in himself. A summary of those numerous evaluations illustrates that, despite the nature of the current offense, Mr. Asbury takes responsibility for his actions, is remorseful, and has dedicated himself to remaining substance free. Since 1999, the CDC's own experts have consistently concluded that if released into the community, Mr. Asbury's violence potential is considered no greater than the average citizen.

### 1. Psychological Evaluation, July 2004

Mr. Asbury's psychological evaluation in July 2004 was an extensive report submitted by Mr. Joe. Reed, Ph.D., Staff Psychologist. Exh. C pp. 338-342. This report was an addendum to the previous psychological evaluation completed by Dr. Reed in February 1999. Exh. A. pp. 75-80. The changes that Dr. Reed notes between 1999 and 2004 are significant because they demonstrate Mr. Asbury's consistent improvements over the years. By evaluating Mr. Asbury on more than one occasion, Dr. Reed has greater insight into Mr. Asbury as a person, a greater ability to appreciate the advancements Mr. Asbury made, and a greater ability to make an accurate assessment of current dangerousness.

### a. Programs and Treatment

One of the stated reasons prior Board Panel's had denied Mr. Asbury a parole date was the belief that he had not taken advantage of sufficient programs to help him deal with his addiction. In both the 1999 and 2004 reports, Mr. Asbury is diagnosed as having polysubstance dependence, in full remission, in a controlled environment. Exh. A p. 78, see also Exh. C p. 339. In his 1999 report, Dr. Reed documented Mr. Asbury's prior Alcoholics and Narcotics Anonymous participation noting how at the time of that evaluation Mr. Asbury was not currently attending either program. Exh. A p. 77. As noted above, the 1999 Board Panel, in denying a parole date, found Mr. Asbury had not participated in sufficient self-help and therapy, and recommended he do so to qualify for a parole release date. In his 2004 report, Dr. Reed documents that Mr. Asbury attended twelve months of Alcoholics Anonymous in 2002. Exh. C p. 339. This evidences one of Mr. Asbury's most significant advancements. By attending Alcoholics Anonymous and working with the 12-steps, Mr. Asbury has developed the skills necessary to address his addiction. Additionally, Dr. Reed noted "[Mr. Asbury] does appear to understand the relationship of abusing drugs, including alcohol with violent behavior and poor judgment. He states that he does intend to not ever use drugs or alcohol again." Exh. C p. 340. Now, having addressed his addiction and fulfilling prior board recommendations regarding self-help and therapy, Mr. Asbury cannot reasonably be found to pose a "current" risk of

dangerousness. Mr. Asbury's inability to continue in the Alcoholics Anonymous program due to overcrowding obviously cannot be held against him. This is especially true in light of the fact that Mr. Asbury remains committed to recovery by engaging in self study of the 12-steps and remains on the waitlist to return to the structured program when space becomes available.

### b. Assessment of Dangerousness

Perhaps more important than Mr. Asbury's participation in treatment is the notable change in Dr. Reed's assessment of Mr. Asbury's dangerousness between the 1999 and 2004 reports. This is highly significant since the 2005 Board found Mr. Asbury's "current" dangerousness level too high to warrant setting of a parole date at that time. In 1999, Dr. Reed found that "[Mr.] Asbury's violence potential within a controlled setting is considered to be *average to that of the average inmate in this level two population*." Exh. A p. 79, emphasis added. Additionally, "if released into the community his violence potential [was] considered to be no more than the average citizen in the community if he remains drug free." (*Id.*) In 2004, Dr. Reed concluded that "[Mr. Asbury's] risk for violent behavior within a controlled setting is considered to be *below average relative to this level II inmate population*." Exh. C p. 340, emphasis added. Dr. Reed administered two psychological exams to Mr. Asbury. In his report, Dr. Reed provides the "results...indicate a *low risk of future violence for this inmate* with (sic.) a controlled setting relative to other inmates, *and by extension, a low risk of future violence in the community setting* relative to other inmates." Exh. C p. 341, emphasis added. Again, Dr. Reed concluded that if released, *Mr. Asbury's risk for future violence is no greater than the average citizen* if he remains substance-free. *Id.*, emphasis added. The fact that Mr. Asbury's violence potential is now lower than the average inmate demonstrates the advances that he has made in reforming his life and how there is no professional evidence supporting the Board's conclusion that Mr. Asbury is currently dangerous.

### 2. Psychological Evaluation, February 2005.

Mr. Asbury's 2005 Psychological Evaluation was also conducted by Dr. Reed. Exh. C, p. 343. The 2005 evaluation, one (1) page in duration, simply reinforces Dr. Reed's 2004 conclusions supporting release. The only variance between the 2004 and 2005 reports is that in the 2005 evaluation Mr. Asbury corrected Dr Reed with regard to what certifications he had received indicating that he received a certificate of achievement for computer modifications, but

11

1    not computer repair or electronics.[14]

2        It is clear from the above that there is no expert opinion evidence to support a finding that

3    Mr. Asbury poses any current risk to the public.

4    **D.  *Advances Made During Incarceration***

5        Mr. Asbury has made significant advancements during his over twenty seven (27) years

6    in custody.  Over time, with age and maturity, Mr. Asbury has come to fully appreciate the

7    impact of his substance abuse.  His educational, vocational and personal accomplishment all

8    demonstrate why there is no evidence to support a finding that Mr. Asbury currently poses a risk

9    of danger to the public.

10       **1. *Education:***

11       Mr. Asbury received his first General Equivalency Diploma (G.E.D.) while in the

12   military in 1973 and his second G.E.D. while in custody in 1980.  Exh. A p. 75.  While in

13   custody for the instant offense, Mr. Asbury has taken numerous courses earning him twenty-

14   seven (27) units of college credit as calculated by the 2005 Board Panel.[15]  Exh. B p. 334.  As of

15   1999, his measured grade level was 14.9.  Exh. A p. 75.

16       **2. *Work/Vocational Training:***

17       Despite having confirmed job offers, during his incarceration, Mr. Asbury has worked

18   hard to develop skills necessary to enhance his employability and success on parole.  In addition

19   to the previously described college study, Mr. Asbury has become certified in small engine repair

20   and computer modification.  Exh. C, pp. 341, 343.  Additionally, Mr. Asbury has used his skills

21   and expertise to assist other students while working as a teacher's aide in the Vocational

22   Computer Repair program.  Mr. Asbury worked with that program until its suspension in

23   September 2003.  Exh. A p. 10.  Mr. Asbury has also worked regularly throughout his

24   incarceration.

---

[14] Petitioner requests this Court take note of this fact because the 2005 Board comments on the alleged "discrepancies" in Dr. Reed's report in an apparent attempt to discredit his conclusions regarding current dangerousness. Exh. B pp. 330-331. These discrepancies include Dr. Reed's report stating that Mr. Asbury has not received a disciplinary since 1997, when in actuality it has been since 1993. Additionally, the Board takes issue with the number of college units Petitioner is said to have received. This, of course, is not substantive as applied to the psychological evaluation, and in no way undermines the value or credibility of the report.

[15] Petitioner requests this Court take notice of the fact that there is disagreement over the number of college units Petitioner has received. This number ranges from a low of 27 units as calculated by the 2005 Board, to 82 units as documented in various Psychological Reports. Petitioner cannot be held responsible for this discrepancy. From the record it appears that several of Petitioner's courses were suspended before completion. As a result, Petitioner did not automatically receive credit for those courses. However, when evaluating his education level, several reports award Petitioner credit for those courses which were suspended.

Mr. Asbury's health has limited the variety of employment available to him. As a result of spina bifida occulta, Mr. Asbury has chronic back pain and a decreased ability to walk, and needs the assistance of a cane. Exh. C p. 338. As the years pass, Mr. Asbury's health has deteriorated rapidly. The physical difficulties associated with his spina bifida occulta are compounded by Mr. Asbury's history of seizures, a chronic knee injury, renal failure, and lung and lower intestinal tract problems. Exh. A p. 7. In spite of these serious medical concerns, Mr. Asbury remains positive, forward thinking, and eager to rejoin the work force when released. With his extensive training and current skill level, Mr. Asbury is more than prepared to pursue a variety of career opportunities at United Textile, where an open offer of employment awaits.

### 3. Self-Help Programs:

At each and every parole suitability hearing, the Board panel has evaluated Mr. Asbury's record for participation in self-help programs, and at each and every parole suitability hearing the respective Board has concluded that Mr. Asbury has not sufficiently participated. Additionally, each Board panel has recommended that Mr. Asbury participate in programming before his next hearing. Regardless of what programs Mr. Asbury has participated in or completed, the Board panels have made precisely the same findings. Furthermore, the very reason for self-help is to assist in remedying a problem and teach positive coping skills. Mr. Asbury has been in alcohol remission for over a quarter of a century, free from any substance use for two (2) decades, and has remained disciplinary free for the last fifteen (15) years, thus it is clearly evident that Mr. Asbury has obtained the skills and training necessary to maintain a healthy and productive lifestyle.

Mr. Asbury has participated in a substantial amount of self-help programming to address his substance abuse. Mr. Asbury attended individual psychotherapy with Dr. Meyer in 1989. Exh. C p. 340. Although Mr. Asbury's participation in Alcoholics Anonymous has not been consistent throughout his incarceration, he has participated significantly in the program when available. He enrolled in Alcoholics Anonymous in February 1989 in compliance with a Board recommendation. Exh. A p. 23. He completed the "Braking Barriers" program in 1991. Exh. A p. 46. Mr. Asbury's 1993 psychiatric evaluation documents Mr. Asbury's belief in a lack of actual confidentiality in the Alcoholics Anonymous at the prison, where correctional officers are allowed to observe and listen to the meetings, and that as a result, he was not comfortable in participating. Exh. A p 46. Despite this concern, Mr. Asbury returned to Alcoholics Anonymous and Narcotics Anonymous. His Post conviction Progress Reports document his

13

attendance in 2002. Exh. A pp. 12-13. The only reason that Mr. Asbury was not currently involved in Alcoholics Anonymous at the time of the 2005 hearing is because the number of meetings offered has been cut back significantly. As a result, individuals who have participated in the program for over one year, such as Mr. Asbury, are removed from the program, placed on a waitlist, and required to wait until space becomes available. Exh. A p. 13; see also Exh. B p. 306. Mr. Asbury was on the waitlist at the time of the 2005 hearing. Exh. D p. 344. Despite this, Mr. Asbury has continued to study the 12-steps independently, as explained during his 2005 parole suitability hearing. Exh. B p. 309.    The 2005 Board's finding that Mr. Asbury had not sufficiently participated in self-help is entirely unreasonable in light of the documented fact that such programs were unavailable, and in light of his self-study in the interim. Exh. B p. 332. Mr. Asbury cannot be held responsible for CDC's inability to provide sufficient programming space to prisoners. Under these circumstances, self-study of the 12-steps was all that was available to Mr. Asbury. The fact that Mr. Asbury took it upon himself to continue his recovery through self-study, demonstrates his commitment to overcoming addiction.    It also demonstrates how through years of therapy and introspection Mr. Asbury has come to understand the parallel between abusing drugs and alcohol and uncontrollable behavior and has remodeled his life accordingly.    Of course, as a factual matter, Mr. Asbury has remained drug and alcohol free for the last two (2) decades, despite what correctional experts describe as the ready availability of drugs and alcohol in the institutional setting.


### 4. Disciplinary Record:

The Disciplinary Sheet used in 2003 shows that Mr. Asbury has received five non-disciplinary CDC-128'A's.[16]  Id. As noted by Dr. Reed in 2004, he has only received two disciplinaries involving anything that could be characterized as violent behavior. Exh. C, p. 340. In 1984 Mr. Asbury received a disciplinary for a verbal threat, and twenty-two (22) years ago, in 1985 for a fistfight. Dr. Reed also noted, "[Mr. Asbury] has never received a disciplinary for significant violent behavior." Id. Although Mr. Asbury received a disciplinary for possession of a controlled substance in 1987, according to Dr. Reed, "he has remained abstinent from drug abuse and any disciplinaries related to controlled substances for 17 [now twenty one] years." Id.

---

[16] CDC 128A's are counseling chronos, and are not considered disciplinaries for parole suitability purposes. *In re Mark Smith* 109 Cal.App.4th 489 (2003).

At every parole suitability hearing since 1993 Mr. Asbury has been commended for remaining disciplinary free, yet the Board continually includes in their recommendations that he remain disciplinary free. For the next twelve years preceding the 2005 hearing, Mr. Asbury has gone without receiving any disciplinary write-ups, or for that matter, any counseling chronos. For those twelve years, his behavior has been exemplary in every respect. Yet, each Board Panel has failed to recognize these achievements. Each Board Panel has systematically focused on the nature of the crime itself, Mr. Asbury's prior criminal record, and his pre-incarceration history of addiction. However, after what is now twenty-nine (29) years, those factors lack probative value on the issue of whether Mr. Asbury poses a current risk of dangerousness. Mr. Asbury's ability to remain disciplinary free for the last fifteen (15) years in prison demonstrates the formidable changes he has made in himself. With time comes maturity, and with maturity the ability to calmly and rationally resolve situations, as he has effectively demonstrated. These last fifteen (15) years demonstrate Mr. Asbury's maturity, and show that there is no disciplinary related evidence that can support a finding that Mr. Asbury currently poses a risk of dangerousness.

### 5. Parole Plans:

Mr. Asbury has very stable and realistic parole plans. He has a residence, a wife, a supportive community of friends, and a solid offer of employment all awaiting his release. In order to reacclimatize himself to society, Mr. Asbury plans to check into an out-patient therapy program at the Veterans Administration Hospital in Livermore, close to his home. Exh. E p. 346. Cognizant of the need to continue treatment in order to remain abstinent from alcohol, Mr. Asbury will regularly participate in his local Alcoholics Anonymous program, which of course would undoubtedly be an express condition of parole. *Id.*

At his 2005 parole suitability hearing, Deputy District Attorney Sousa expressed his belief that Mr. Asbury had not taken sufficient steps to investigate treatment programs. He stated: "What I expected to see was a copy of a letter the inmate had sent the group and a response from the group saying, yes, we have your letter. Here's what you need to do when you get out. We'll be waiting for you. Here's the person you can contact..." Exh. B pp. 320-321. This viewpoint reflects a fundamental misunderstanding of how Alcoholics Anonymous functions. In fact, such letters of verification are not available from either the Veterans

Administration or the Alcoholics Anonymous Fellowships.[17] It is unreasonable to penalize Mr. Asbury for failing to receive verification from these programs when verification is unavailable. Mr. Asbury's research is the only affirmative step that Mr. Asbury can take at this time until he is granted a definite parole release date.

Mr. Asbury also has very positive residential and employment plans. The 2005 Board recognized this, but then concluded inexplicably: *We do know that you have a job offer and that your wife has been a long-time supporter of you for over 20 years* that you've been married, so we do take all of that into consideration today, and *it's not a reason for denial, but it is a concern.*" Exh. B p. 332, emphasis added. The Board provides absolutely no explanation as to why Mr. Asbury's job offer and long-term relationship should be a "concern." Those factors are precisely what the Board should be looking at as positive factors speaking favorably of parole. In the course of the hearing Mr. Asbury stated: "I abhor the smell of alcohol. It makes me sick even to smell it, even to smell it on someone else. I've pushed my wife away when she's come up to visit because she had a drink three days before and I could still smell it on her. I cannot stand the smell." Exh. B p. 327. In their denial the Board referenced this comment as a problem with Mr. Asbury's parole plans. They stated how as part of his parole conditions Mr. Asbury will need to be in a place where neither he, nor anyone else, drinks alcohol, and concluded from Mr. Asbury's comments that "it does not appear your wife is a suitable placement for parole at this point, as of today." Exh. B p. 331-332. This determination is ridiculous. Mrs. Asbury is not currently under any restrictions prohibiting her from drinking alcohol. Her decision to have an alcoholic beverage while Mr. Asbury is in custody has no relevance to whether her home is suitable placement for parole in the future. The Board's use of Mr. Asbury's comment as a basis for denying him a parole date, when made clearly with the intent of indicating to the Board his dedication to remaining substance free, is misplaced and irrational.

---

[17] The Veterans Administration (VA) no longer provides inmates with confirmation letters stating that they have a bed upon release. This is due to prior experiences where individuals have been paroled on the basis that they have placement at the VA and then fail to report to treatment. In contacting the VA, they state that they are more than willing to work with an individual and their parole office upon release to find an appropriate program. If the patient grants the VA authorization, the VA will report to the individual's parole officer thereby ensuring that he is meeting his conditions of parole. Additionally, it takes approximately one and a half to two weeks between screening and placement in a program. Therefore, once Mr. Asbury has been granted a definite parole release date he will be able to contact the VA, be screened via telephone, and placement will be available upon his release.

The Alcoholics Anonymous Fellowships do not require pre-enrollment or that an individual secure a place at any meeting. These programs are much more informal, offering frequent meetings, at varied hours. Upon release, Mr. Asbury may simply show up at any meeting, at any Fellowship, that works with his schedule.

In addition to his parole plans, Mr. Asbury has everything necessary to perform successfully on parole. He has numerous skills and has completed substantial vocational training as discussed above. Even absent the offer of employment from United Textiles, Mr. Asbury is well qualified for a variety of employment opportunities. Mr. Asbury has been married to his current wife for twenty six (26) years. Their relationship has been repeatedly described as warm and supportive. Exh. C p. 340. Her dedication Mr. Asbury speaks strongly as evidence of the supportive community Mr. Asbury has waiting for him upon release. This is further evidenced by the numerous letter of support from family, friends and potential employers. Exhs. C & D. The fact that the Board Panel concludes that these positive factors are a "concern" in their denial of a parole release date evidences the arbitrary and capricious nature of the hearings.

Despite Mr. Asbury's stable and realistic parole plans, such plans have no bearing on an inmates release to parole.[18] As the memorandum from D.L. Lamotta indicates, release to parole is not dependent upon having a residence or employment. Exh. M. According to the Parole and Community Services Division (P&CSD) free substance abuse programs are also available state-wide for parolees. Parolees access these programs though their assigned parole agent. *Id.* In light of this memorandum, Mr. Asbury has gone above and beyond what is necessary to establish parole plans for his release. According to the P&CSD memorandum he need not have a residence, employment nor a treatment program lined up, yet Mr. Asbury has all three. Mr. Asbury can do nothing further to demonstrate that he poses no current risk of dangerousness and is prepared for parole success. Therefore the denial of a parole release date at the 2005 hearing was clearly a denial of Mr. Asbury's right to due process.

### E. Current Parole Suitability Hearing, January 5, 2005.

On January 5, 2005, Mr. Asbury had his *eighth* parole suitability hearing.[19] This hearing

---

[18] Petitioner requests this Court take notice of the memorandum from D.L. Lamotta, Chief, Program Support Unit, Parole and Community Services Division. Exh. M. That memorandum states in part: "The fact that you have no place to live or work does not have a bearing on your release to parole." Additionally significant is the section on substance abuse treatment which states: "For parolees who have a history of substance abuse, the P&CSD operates several substance abuse treatment programs. These are located throughout the State and include the Substance Abuse Treatment and Recovery Program and the Parolee Services Network." These programs and services are free to all parolees.

[19] As previously noted, Petitioner was not given his parole suitability hearing in 2003 as he was entitled to have. Petitioner also requested that the absence of the 2003 hearing be documented in the record, to which the Board responded without concern. The Board stated the remedy for such occurrence is to have a hearing, and that since Mr. Asbury was receiving his 2005 hearing, the absence of a 2003 hearing was irrelevant in their view. Exh. B p. 276. This further exemplifies the arbitrary nature of the parole suitability hearings. If they were not arbitrary, the Board would have a much stronger interest in making sure that all hearings were held in a timely fashion.

is the subject of these proceedings.

Mr. Asbury's most recent Life Prisoner Evaluation Report was completed in December, 2003.[20]  See Exh. A, 9-15.  Since Mr. Asbury did not receive a Life Prisoner Evaluation Report in preparation for his 2005 parole suitability hearing the Board relied upon the report prepared in anticipation of the 2003 hearing that was never held.  (Exh. B p. 285.)  By failing to provide Mr. Asbury with an updated Life Prisoner Evaluation Report, the Department violated its own policies and procedures.  In addition to this violation, Mr. Asbury was denied the opportunity to be evaluated at the present time, in light of the changes and advancements he had made since 2003.  The Board's failure to meet their own internal policies and procedures, exemplifies one of the many significant errors which occurred at Mr. Asbury's 2005 parole suitability hearing.

In addition to the 2003 Life Prisoner Evaluation Report the 2005 Board also had Dr. Reed's psychological evaluation reports from 2004 and 2005.  Each of those reports concludes that absent future substance abuse, Mr. Asbury's prognosis for leading a law-abiding, productive, and non-violent life is excellent.  Exh. C.  Dr. Reed examined Mr. Asbury three (3) times between 1999 and 2005.  His reports document Mr. Asbury's progress with regards to potential to violence as discussed above.  In both 1999 and 2004 Dr. Reed concluded "Mr. Asbury is competent and responsible for his behavior.  He has the capacity to abide by institutional standards."  Exh. A p. 79, Exh. C p. 341.  Mr. Asbury's capacity to abide by institutional standards indicates his ability to follows rules.  His ability to follow rules indicates his ability to conform his behavior to the conditions of parole.  These conditions will clearly include participation in a substance abuse program.  Participation in such a program will even further strengthen Mr. Asbury's recognized commitment to refrain from using drugs or alcohol ever again.  Exh. C p 340.  Mr. Asbury's acknowledgement of responsibility for his actions, expression of regret and remorse over the death of Mr. Jackson, his strong commitment to remaining substance free, and increasing maturity all support Dr. Reed's conclusion that Mr. Asbury's "risk for future violence potential appears to be *no greater than the average citizen in the community*, if he remains substance free." Exh. C 341, emphasis added.

Despite a lack of evidence indicating current dangerousness and the requirements of *Penal Code* §3041(a), the 2005 Board Panel denied Mr. Asbury a parole release date.  The Board failed to make a true factual basis for its finding, relying instead on arbitrary, boilerplate

---

[20] Petitioner's Life Prisoner Evaluation Report from 2003 is discussed more fully in the above section entitled *"Absence of a Parole Suitability Hearing in 2003."*

language that has become commonplace through the Board's reliance on BPT form 1000a, the form used to deny parole. In the instant case, denial was based heavily upon the immutable facts of the commitment offense. Nearly twenty-nine (29) years after the commission of the crime, these facts have not changed. The Board described the crime with boilerplate language stating it "was one of the more brutal crimes," "shows a lack of regard for the life and suffering of another," and "was carried out in a cruel fashion on a vulnerable victim." Exh. B p. 329.

Secondly, the Board relied on their determination that Mr. Asbury had allegedly not participated in sufficient levels of self-help. Regardless of what self-help programming Mr. Asbury attended, every Board Panel has concluded that he has not participated in sufficient levels of self-help, despite the fact that his actual participation has been 100% effective in keeping him substance free for two (2) decades, alcohol free for nearly 29 years, and entirely discipline free for 15 years. Between his 2001 denial and his 2005 hearing, Mr. Asbury participated in Alcoholics Anonymous to the extent it was available, continued self study on his own when it was not, and was on the waiting list to rejoin the structured program at the time of the hearing. He has further continued to diligently work on the 12 steps on his own, whether or not officially sanctioned programming is available. Of course, it is patently unreasonable for the Board to find Mr. Asbury had not sufficiently participated in self-help programming when no such programming is presently available to him, particularly when the evidence is clear that what he is in fact able to do is fully effective in his rehabilitation.

Although parole plans including a residence or employment should have no bearing on a release to parole, as indicated by the memorandum from D.L. Lamotta (see Exh. M), Mr. Asbury has excellent parole plans in place. Furthermore, the Board relied upon the letters from the Los Angeles Police Department and the Los Angeles County District Attorney's Office, both of which are opposed to a finding of parole suitability. These letters do nothing to describe the character of the person that Mr. Asbury has become, but are merely form letters, prepared by reference to the original police reports. This genre of letter provides no assistance in determining whether Mr. Asbury poses a current risk of dangerousness. Although numerous letters of support were submitted on behalf of Mr. Asbury from his family, friends, and potential employers these letters and are not even mentioned in the Board's decision.

The 2005 Board panel focused on the claimed, minute inaccuracies in Dr. Reed's reports, none of which are even relevant to the Doctor's findings regarding future violence potential, in an attempt to discredit reports wholly supportive of Mr. Asbury's release. Other than discussing

19

their inaccuracies, the Board ignores Dr. Reed's reports when making their findings. This is highly significant in light of the fact that Dr. Reed examined Mr. Asbury in 1999, 2004 and 2005. His conclusions in 2004 and 2005 reflect a thorough evaluation of Mr. Asbury following a significant period of time. The fact that the Board is willing to discredit Dr. Reed's evaluation over a discrepancies involving the number of college units received and the mistaken belief that Mr. Asbury's last disciplinary was received in 1997 instead of 1993 shows the lengths the Board is willing to go to in ignoring the evidence favoring parole suitability.

Lastly, the Board did what it does in virtually every case by purporting to "commend" Mr. Asbury for his achievements. Here the Board stated:

> We commend you for the fact that you've not had a 115 for over 10 years,[21] the fact that you have not had a 128(a) counseling Chrono since 1988, that you did complete some 27 units of college work, had your GED, that you completed small engine repair and have spent time in computer refurbishing, that you did participate, at some point, in AA had have ongoing participation in hobby craft. Exh. B pp. 333-334.

Despite the fact that these activities fulfill each and every prior Board's recommendations, the 2005 Board found that "these positive aspects of [his] behavior do not outweigh the factors of unsuitability." *Id.* at 334.

The commissioner then recited the recommendations that Mr. Asbury remain disciplinary free and participates, when available, in structured self-help. *Id.* Since his last denial in 2001, Mr. Asbury had remained disciplinary free, upgraded vocationally, and participated in structured self-help when available. He had not received any disciplinaries, was assigned to the Vocational Computer Repair program as a teacher's aide, and participated in Alcoholics Anonymous until he could no longer attend due to overcrowding. Based upon the 2001 Board's language it appears that Mr. Asbury met all of the requirements necessary to result in the grant of a parole date. The Board has the duty to make their recommendations "sufficiently clear." *United States v. Guagliardo,* 278 F.3d 868, 872 (9th Cir. 2002) [citing *Graynet v. City of Rockford,* 408 U.S. 104, 108-109 (1972)].[22] By denying Mr. Asbury parole in 2005 after he fulfilled the 2001 Board's "sufficiently clear" recommendations, leads to only one inescapable conclusion: that the

---

[21] Mr. Asbury's last 115 was February 13, 1993. Therefore, at the time of the January 5, 2005 hearing Mr. Asbury had gone 11 years and 11 months (approximately 12 years) without a disciplinary.

[22] A prisoner's due process rights are violated if parole conditions are not made "sufficiently clear" so as to inform him of what conduct will result in his being returned to prison. Likewise, the Board of Prison Terms has a duty to make recommendations for parole eligibility "sufficiently clear" so as to inform the inmate of conduct that will warrant a finding of suitability. (See *United States v. Guagliardo, supra,* 278 F.3d 868.)

Board summarily denied Mr. Asbury a parole release date in violation of his right to due process.

## LEGAL ARGUMENT

### I. HABEAS CORPUS IS THE PROPER REMEDY BY WHICH TO TEST THE PROPRIETY OF A DENIAL OF PAROLE BY THE BOARD

This Court can entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Here, Petitioner's Due Process rights have been violated by the State Board of Parole Hearing's repeated refusal to grant parole despite Petitioner's federally protected liberty interest in parole.

This Court may grant Petitioner relief if it finds that the state court's adjudication on the merits "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas Court may grant the writ if the state court fails to apply to apply the correct controlling Supreme Court authority or it arrives at a conclusion opposite to that reached by [the Supreme] Court on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362 (2000). Under the "reasonable application clause," relief is proper if the state court's application of clearly established law was both incorrect and unreasonable. *Id.* at 411. The Supreme Court has determined that the "objectively unreasonable" standard is more deferential than review for clear error. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

The Ninth Circuit has developed a two-part analysis when evaluating the state court's fact-finding under the "unreasonable determination" clause of § 2254(d)(2). First, an intrinsic review by the federal courts must be done to examine the state court's fact finding process. *Taylor v. Maddox*, 366 F.3d 992, 1000-1 (9th Cir. 2004). If the state court's fact-finding process fails this test, or if it did not engage in any fact finding, the state court decision is not accorded any weight, or a presumption of correctness, and the federal court is free to fully re-evaluate the factual issues. It is only where state court's fact finding survives the intrinsic review, that the state court's findings are presumed to be correct. *Id.* at 1000. Even if the presumption of

21

correctness applies, in applying 28 U.S.C. § 2254(d)(2), a federal court may still grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." 28 U.S.C. § 2254(d)(2).  Thus, a petitioner can rebut the presumption of state court correctness by a showing based on clear and convincing evidence. *Id.* at 2254(e)(1).

Ordinarily, "a State's highest court is the final judicial arbiter of the meaning of state statutes." *Gurley v Rhoden*, 421 U.S. 200, 208 (1975).  However, an exception to this is when it appears that the State's interpretation is an obvious "subterfuge" to evade the consideration of a federal issue. *Peltier v. Wright*, 15 F.3d 860, 862 citing *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).  The Supreme Court has further held that "[o]nce ambiguities as to the meaning of the statute are resolved, [the federal courts] may form [their] own judgment as to its operative effect." *Wisconsin v. Mitchell*, 113 S.Ct. 2194, 2199 (1993).

In applying § 2254 (d)(1) & (2) criteria, a federal court looks to the decision of the highest state court to have addressed the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 9th Cir. (2000).  It also looks to any lower court decision examined and adopted by the highest state court to address the merits.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Williams v. Rhoades*, 354 F.3d 1101, 1106 9th Cir. (2004).  Here, Mr. Asbury filed a Petition for Writ of Habeas Corpus in the Los Angeles County Superior Court on February 10, 2006.  His petition was subsequently denied on August 6, 2007.  In denying Mr. Asbury's petition, the court failed to address the arguments made by Petitioner and simply denied the petition by reciting the circumstances of the offense, without any further explanation or evaluation of his exemplary rehabilitation and without providing a nexus between Mr. Asbury, *twenty eight (28) years after* the commitment offense and the allegation that he currently poses a risk of danger if released. Exh. O.  The Court of Appeal and California Supreme Court each issued summary denials.  Exhibits O & Q.  The superior court did not make any factual findings, and thus there is nothing to which the "presumption of correctness" of §2254 can apply.  The issue herein concerns the level of proof at the hearing regarding Mr. Asbury' current dangerousness, over twenty eight (28) years after the offense. Obviously, he has already been sentenced, and that sentence includes the possibility of parole, so long as he is not a current and unreasonable threat to society. *Cal. Code Regs.*, tit. 15, §2402(a).  Thus, the threshold issue is whether the Board even reached a conclusion that Petitioner is a *current* and unreasonable threat to society, which they did not.  Even if such a finding had been made, such a conclusion

22

finds no support in the record. The failure of the superior court to recognize the correct focus of the review as being on *current* dangerousness, and its conclusion that the Board ruling was supported by "some evidence," is what Petitioner contends is improper.

### A. PETITIONER HAS A FEDERALLY PROTECTED LIBERTY INTEREST IN PAROLE.

The Board violated Petitioner's due process rights by failing to find him suitable for parole, thus depriving him of a liberty interest. The Fifth and Fourteenth Amendments prohibit the government from depriving an inmate of life, liberty or property without due process of law. U.S. CONST. Amends. V, XIV. In order to prove a violation of due process, an inmate must prove two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections. *McQuillion v. Duncan*, 306 F.3d 896, 900 (2003) [hereafter "*McQuillion I*"]; *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 9th Cir. (1998).

The United States Supreme Court in *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979) concluded that a state's statutory parole scheme, if it uses mandatory language, may create a presumption that parole release will be granted when or unless certain designated findings are made, and such language gives rise to a constitutionally protected liberty interest in parole being granted. See also *Board of Pardons v. Allen*, 482 U.S. 369, 376-78 (1987) [Montana's parole statute which uses language that the board "shall" release prisoner, absent falling within the listed exceptions, creates a due process liberty interest in release]. Similarly, the Supreme Court found that the language of Nebraska's parole statute gives rise to a liberty interest in release on parole. *Greenholtz, supra*, 442 U.S. at 11-12 [concluding the use of "shall" in Nebraska's parole statute creates a due process liberty interest in release on parole]. Thus, where certain language is used that gives rise to a liberty interest in parole, a prisoner gains a legitimate expectation in parole and this liberty interest cannot be denied without adequate procedural due process protections. *Allen, supra*, 482 U.S. at 373-81; *Greenholtz, supra*, 442 U.S. at 11-16.

In California, it has been determined that *Penal Code* §3041, the statute that controls parole for life prisoners, uses mandatory language and is virtually identical to the language and schemes used in *Allen* and *Greenholtz*, thereby creating a protected liberty interest in parole release. *McQuillion I, supra*, 306 F.3d at 902; *see also, Michael v. Ghee*, 498 F.3d 372, 378 6th

23

Cir. (2007); *Ellis v. District of Columbia*, 84 F.3d 1413, 1418 D.C. Cir. (1996); *Sass v. Board of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006); *Irons v. Carey* [hereinafter *Irons II*], 479 F.3d 658 (9th Cir. 2007). Section 3041, subsection (b) is the substantive standard which states:

> "The panel or board *shall* set a release date *unless* it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Emphasis added.

Accordingly, under the clearly established framework provided by the Supreme Court in *Allen* and *Greenholtz*, Penal Code § 3041 creates a liberty interest in parole. *McQuillion I*, *supra*, 306 F.3d at 902; see also *Biggs v. Terhune*, 334 F.3d 910, 915-16 (9th Cir. 2003), and the other Ninth Circuit cases cited above. In light of these authorities, the Ninth Circuit has unequivocally confirmed that California inmates continue to have a constitutionally protected liberty interest in parole even after *Dannenberg I*. *Sass*, 461 F.3d at 1125. The court, in *Sass*, relied upon the Supreme Court's reasoning in *Greenholtz* and *Allen* to conclude that a statute's mandatory language creates a presumption that parole will be granted, and as such, a cognizable liberty interest exists. *Id.* at 1127. In doing so, it confirmed the decisions in *McQuillion I* and *Biggs* when it concluded "California's parole scheme gives rise to a cognizable liberty interest in release on parole" and a "liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." *Id.* at 1127 [citing *McQuillion*, *supra*, 306 F.3d at 902; *Biggs*, *supra*, 334 F.3c at 317].

Thus, because California prisoners have a constitutionally protected liberty interest in parole release, neither the Board nor the Governor can decline to grant a parole date or rescind an already granted date, without proper and sufficient procedural protections required by due process. In denying Mr. Asbury parole for the eighth time, the Board denied him a cognizable liberty interest. As a result, he has clearly satisfied the first element in his claim, showing that he has been deprived a constitutionally protected liberty interest.

## II.    THE STATE COURT'S DETERMINATION WAS BOTH UNREASONABLE AND WRONG.

Under 28 *U.S.C.* §2254(d)(2), a federal court may grant habeas relief if a state court's findings resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the proceedings in that court. 28 *U.S.C.* § 2254(d)(2). As held

by the Ninth Circuit, the state court's decision must be both wrong and unreasonable. *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) [citing *Lockyer v. Andrade*, 528 U.S. 63, 75 (2003)]. Here, the actual fact finding is in the Board of Parole Hearings proceedings. No additional fact finding occurred at the superior court level, or in the court of appeal. Of course, no factual findings are possible in the California Supreme Court on a petition for review. To the extent that the California superior court engaged in "fact finding" of any type, it did so without the benefit of any process by which the parties could even participate.

In *Maddox*, the Ninth Circuit presented a two-part analysis under § 2254(d)(2). The Court stated that first, federal courts must undertake an "intrinsic review" of the state court's fact finding procedure. *Taylor v. Maddox, supra*, 266 F.3d at 1000.[23] If the state court's fact-finding process fails this test, the state court decision is not accorded any weight, and the federal court is free to fully re-evaluate the factual issues. The second part of the analysis is utilized only where state court's fact finding survives the intrinsic review, and then the state court's findings are presumed to be correct. *Id.* at 1000. However, even if the presumption of correctness applies, in applying 28 *U.S.C.* § 2254(d)(2), a federal court may still grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." 28 *U.S.C.* § 2254(d)(2). Here, no presumption applies, as no facts were found by the state courts.

### III. CONTINUED RELIANCE ON THE COMMITMENT OFFENSE VIOLATES DUE PROCESS; THE IMMUTABLE FACTS OF THE CRIME NO LONGER HAVE PREDICTIVE VALUE AS TO PETITIONER'S CURRENT THREAT TO SOCIETY.

#### A. THE FOCUS IS ON CURRENT DANGEROUSNESS

The rapidly growing body of current case law is clear that a reviewing court must reverse a denial of parole by the Board or Governor when there is no reliable evidence which rationally shows that the inmate is currently dangerous. The decisions adopting this rule include the state

---

[23] The Court noted that the challenges to state court proceedings may be brought in a number of ways, for instance, "where the state court should have made a finding of fact but neglected to do so[;]…where the state court does make factual findings, but does so under a misapprehension as to the correct legal standard[;]…and, where the fact finding process itself is defective." *Taylor v. Maddox, supra*, 366 F.3d at 1000-01.

court cases of *In re Scott* [hereinafter *Scott II*][24] 33 Cal.App.4th 573, 594-595 (2005) [request for stay of inmate's release & request for depublication denied by Cal. Supr. Ct. at #S138430], *In re Lee* 143 Cal.App.4th 1400, 1408-1409 (2006), *In re Elkins* 144 Cal.App.4th 475, 499, 521 (2006) [pet'n for rev. & req. for depubl. denied at S148058; applic. for stay denied, at S147840], *In re Barker*, 151 Cal.App.4th, 346, 365 (2008) [no pet. for rev. filed], *In re Weider*, 45 Cal.App.4th 570, 589 (2006) [no pet. for rev. filed], *In re Gray, supra*, 151 Cal.App.4th at 383 [depubl. request denied at S153831]. Federal cases adopting this rule also include *Sanchez v. Kane* 444 F.Supp.2d 1049 (C.D. Cal. 2006), *Rosenkrantz v. Marshall* [hereinafter *Rosenkrantz VI*] 444 F.Supp.2d 1063, at 1085 (C.D. Cal. 2006), *Thomas v. Brown*, ___F.Supp.___ [2006 WL 3783555] *3 (N.D. Cal. 2006), *Brown v. Kane* ___ F.Supp.2nd ___ [2007 WL 1288448] slip opn., p. 6 (N.Dist. Cal. 2007), *Martin v. Marshall* 431 F.Supp.2d 1038 (N.D. Cal. 2006).

In recent litigation on these issues, Respondent has been arguing that the foregoing state cases are wrongly decided by each of those courts. Notably, in making that argument, Respondent fails to even address the federal decisions on this same point, ignoring a significant batch of federal district court decisions that each follow the teachings of the Court in *Scott II.*, and which apply the same principles applied by the California Court of Appeal in *Weider*. It is axiomatic that the factors of suitability, and the rules of how they are interpreted, must come from state law. See *e.g., Sass,* 461 F.3d at 1135 (Reinhardt, J., dissenting) ["When we assess whether a state parole board's suitability determination is supported by 'some evidence' in a habeas case, our analysis is framed by state law."] In this case, California courts' treatment of similar cases is crucial in determining if the Board is correctly applying the regulatory factors to Mr. Asbury. If they were not, it cannot be said that there was "some evidence" to support their decision – a violation of Mr. Asbury's due process rights.

Of course, that issue is going to ultimately be decided in the *Lawrence* and *Cooper* cases, but in the meantime, it is incumbent on the courts to attempt to discern what direction the California Supreme Court is headed on this issue. That direction is clear from how the high court has been handling the cases coming before it in recent months. While not yet speaking directly on the point, the California Supreme Court has by its actions tacitly approved nearly every one of

---

[24] There are two "*Scott*" decisions. The first was the reversal of the Board's denial of parole, *In re Scott [Scott I]* (2004) 119 Cal.App.4th 871. The second was the reversal of the Governor's action taking Scott's parole date granted at the hearing after the decision in *Scott I*. (*In re Scott [Scott II]* (2005) 133 Cal. App.4th 573.) They will be differentiated herein by the roman numeral designations I & II.

the state court decisions, refusing to hear, depublish or block the release of the inmates in each of them, and each of the federal cases are exclusively following the doctrine that was first stated in *Scott II*.

In *Scott II*, the Court announced the rule that the focal issue is current dangerousness, and with the passage of time, the probative value of the crime based evidence declines until it can no longer show the inmate remains a danger to society. (*Scott II, supra*, at 594-595.) As the court put it, the "circumstances of the crime reliably established by evidence in the record [must] rationally indicate that the offender will present an unreasonable public safety risk if released from prison." *Scott II, supra*, 133 Cal.App.4[th] at 595. Since then, this trend has been supported by the overwhelming weight of the current case law, as cited above, including *Scott II, Barker, Gray, Elkins, Lee, Weider, Martin, Sanchez, Rosenkrantz VI, Thomas* and *Brown*, as well as having been the ruling in both *Lawrence* and *Cooper* before review was granted in those cases. Importantly, all of these cases were decided subsequent to *Dannenberg*, and the Supreme Court not only denied review of most of these cases, they also refused the Governor and the Board's separate requests to block any of those inmates' release or to depublish the opinions.

The *Lee* decision is directly indicative of the Supreme Court's acceptance of the rules it states. In *Lee*, the Court of Appeal had originally denied the habeas petition. The petitioner filed for review in the California Supreme Court, and after briefing, the Court granted review and remanded the case back to the court of appeal, directing that they issue an order to show cause, and reconsider the denial. (*In re Lee*, Case #S142267.) The above cited published decision followed that remand. Then, on February 7, 2007 the California Supreme Court denied the Governor's request to depublish the *Lee* decision. (Cal. Supr. Ct. Case #S149411.) Even in the recent cases where review has been granted, such as *Lawrence* and *Cooper*, the Supreme Court has refused to stay the orders of the appellate courts directing the immediate release of those inmates. (*Lawrence*, Cal. Supr. Ct. Case #S154018; *Cooper*, Cal. Supr. Ct. Case #S155130.) In another example of the Supreme Court's acceptance of this doctrine, in the case of *In re Ross*, case #S149228, the Court granted review and remanded the case with directions that the Court of Appeal issue the OSC and reconsider the issue of "whether the inmate remains dangerous" in light of *Scott II, Lee* and *Elkins*.

Thus, these cases exist as valid authority, with the obvious approval of the California Supreme Court. This focus on current dangerousness directly follows from the Board's own regulations, *Cal. Code Regs.*, tit. 15, §§2402(a) and 2402(a), which only permit the denial of

parole when the inmate "presents an unreasonable risk of danger" to the public if released. Furthermore, the law is now equally clear that a court reviewing a Board's denial must examine whether "some evidence" exists to support a determination that the inmate currently poses an unreasonable threat to society, not whether "some evidence" exists to support the *reasons* given by the Board in making its determination. (*Lee, supra,* 143 Cal.App.4[th] at 1408.) In other words, not just the bare findings (i.e., multiple victims, victim opposition, etc.) are viewed, but the Court is to evaluate if those findings rationally provide evidentiary support for concluding that the inmate is currently dangerous. *Lee, supra,* 143 Cal.App.4[th] at 1408, *Weider, supra,* 145 Cal.App.4[th] at 589-590; See also *Scott II, supra,* 133 Cal.App.4[th] at 595; *Elkins, supra,* 144 Cal.App.4[th] at 499; *Sanchez, supra,* 444 F.Supp.2d 1049; *Rosenkrantz VI, supra,* 444 F.Supp.2d 1063; *Martin, supra,,* 431 F.Supp.2d 1038. Here, no such connection can be made.

Thus, the analysis is a two (2) step approach. First, as the court stated in the case of *In re Mark Smith* 109 Cal.App.4th 489, at 509-505 (2003), the evidence must relate to a regulatory factor. The Court must first evaluate whether the regulatory factor is reliably established, and if so, consider whether the existence of that regulatory factor rationally provides evidentiary support for the Board's conclusion that the inmate remains currently dangerous. *Weider, supra,* 145 Cal.App.4th at 589-590; *Lee, supra,* 143, Cal.App.4th 1408; *Elkins, supra* 144 Cal.App.4th 499; *Scott II, supra,* 133 Cal.App.4th at 595. Even if the crime is one that can be considered "particularly egregious" within the meaning of *Rosenkrantz V,* the inquiry does not end, and the Court must then analyze whether, in light of the passage of time, the number of parole suitability hearings, and in the face of overwhelming evidence of rehabilitation, the crime based regulatory factors can any longer provide evidentiary support for the conclusion that the inmate is currently dangerous. *Id.* Thus, section II(B) & (C) will analyze the effect of the passage of time on the ability of the Board to rely on the crime based findings after the passage of **twenty eight (28)** years.

**B.   THE COMMITMENT OFFENSE IS A FACTOR THAT IS INTIALLY PERMITTED BY STATUTE AND THE REGULATIONS TO MEASURE WHETHER PETITIONER PRESENTS A CURRENT THREAT TO THE COMMUNITY; AFTER A PERIOD OF TIME, IT LOOSES ALL PREDICTIVE VALUE.**

After almost three (3) decades of incarceration, excellent programming, and positive psychological evaluations, Mr. Asbury has reached the point where the commitment offense provides no evidence of current dangerousness. The Board's reliance on the commitment offense to deny parole compels a finding of a due process violation. The statutory and regulatory scheme used to determine parole suitability requires that the Board look to whether Mr. Asbury presents a *current* threat to the community. The statutory linchpin of California's Parole scheme is *Cal. Pen. Code* § 3041. This section requires that setting a parole date is mandatory "unless the Board determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a lengthier period of incarceration." *Cal. Pen. Code* § 3041(b).[25] Thus, the heart of this provision is to determine whether a parole applicant presents a *current* danger. This comports with section 3041's regulatory companion that permits denial of parole only if the inmate will currently "pose an unreasonable risk of danger to society if released from prison." *Cal. Code Regs.* tit. 15 § 2402(a). The Board was thus required by statute and regulation to determine if Mr. Asbury posed a current threat to the community.

The criteria used by the Board are contained within the regulations. *California Penal Code* section 3041 required that the Board promulgate criteria for determining parole suitability. "The [B]oard shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the inmate was sentenced and other factors in mitigation or aggravation of the crime." *Cal. Pen. Code* § 3041(a). It was thus not only proper, but statutorily required that the Board create parole suitability and unsuitability

---

[25] Mr. Asbury has a protected liberty interest in parole since *Cal. Pen. Code* § 3041 is a mandatory parole scheme. *See Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7, 11-12 (1979) [Nebraska parole statute providing that the board "shall" release prisoner subject to certain restrictions, creates due process liberty interest in release on parole]; *Bd. of Pardons v. Allen*, 482 U.S. 369, 376-78 (1978) [Montana parole statute providing that the board "shall" release prisoner subject to certain restrictions, creates due process liberty interest in release on parole].) The Ninth Circuit has consistently followed the Supreme Court, finding that since California's parole scheme provides that the board "shall normally" release a prisoner subject to certain restrictions, this gives rise to federally protected liberty interest. *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002); *Biggs, supra*, 334 F.3d at 914-15.

29

factors to determine a parole applicant's current dangerousness. Section 3041(a)'s mandate to create parole criteria is set forth in *Cal. Code Regs.* tit. 15 § 2402 (Determination of Suitability). Section 2402(c) lists all factors that weigh against a finding of suitability. Specifically, the regulation permits the Board to consider as a factor weighing against suitability, whether the parole applicant "committed the offense in an especially heinous, atrocious or cruel manner." *Cal. Code Regs.* tit. 15 § 2402(c)(1). Accordingly, the Board may use the circumstances of the commitment offense as a factor to find Mr. Asbury unsuitable for parole, if the offense was "heinous, atrocious or cruel," ***but only if those factors show that he remains presently dangerous.***

As discussed below, however, the commitment offense cannot be considered in a vacuum, at the expense of other recent and more relevant factors. As the courts are now consistently holding, due process cannot ignore that repeated reliance on the offense as grounds for denying parole violated due process, as the crime will diminish to the point that the offense cannot serve as evidence of a current threat. *Scott II, supra,* 133 Cal. App. 4th 573; *Rosenkrantz VI, supra,* 444 F.Supp.2d 1063; *Martin, supra,* 431 F.Supp.2d 1038.

### C. AFTER TWENTY EIGHT YEARS OF INCARCERATION AND POSITIVE PROGRAMMING, THE COMMITMENT OFFENSE NO LONGER HAS PREDICTIVE VALUE AS TO MR. ASBURY'S' CURRENT DANGEROUSNESS.

To uphold the Board's denial based on the commitment offense, the court must find there was "some evidence" to support this finding. *Dannenberg I, supra,* 34 Cal. 4th 1061; *Rosenkrantz V, supra,* 29 Cal. 4th 616; *McQuillion I, supra,* 306 F.3d 895, 904. While the commitment offense may have indicated Mr. Asbury' present dangerous for a period of time – and fulfilled the "some evidence" requirement – a series of cases have concluded that the Board cannot continuously rely on the crime as the basis for denying parole. Mr. Asbury' denial of parole by the Board falls squarely within these cases. After twenty eight (28) years of incarceration, rehabilitation, the Board's continued reliance on the commitment offense to deny parole violates due process.

Recent case law makes clear that, assuming *arguendo,* some evidence exists to support a finding that the commitment offense is "especially heinous, atrocious or cruel" within the meaning of §2402(c)(1), due process still prohibits repeated reliance on those unchanging circumstances as grounds for finding an inmate unsuitable for parole in the face of evidence of

rehabilitation. Accordingly, the Board in this case failed to address the appropriate legal concepts governing parole decisions under the United States Constitution, as they failed to acknowledge the complete lack of evidence of current dangerousness. *Lee, supra,* 143 Cal.App.4th at 1408-1409; *Weider, supra,* 145 Cal.App.4th at 589-590 [the "overarching consideration in parole suitability is current dangerousness]. Thus, the assertion that a regulatory finding is supported by "some evidence" does not end the inquiry. As the *Ramirez* court concluded,

> The United States Supreme Court had made it clear the 'some evidence' standard discussed in *Hill, supra,* 472 U.S. 445, is ***only one aspect of judicial review for compliance*** with minimum standards of due process. [Citation] ... The court explained that the 'some evidence' standard applied only to questions of evidentiary sufficiency. It is ***an additional requirement of due process, not a substitute for other established due process requirements***. [Citation.]

> Accordingly, were the Board to determine whether inmates are suitable for parole by flipping a coin, it could not insulate its proceedings from judicial correction simply by identifying 'some evidence' in the record to support each result. *Id.* pp. 563-564 [emphasis added].

In *Ramirez,* the court rejected the Board's contention that due process is satisfied by the mere fact that the hearing panel goes through the right litany of phrases and buzz words, divides the hearing into the relevant statutory and regulatory categories, and discusses the evidence relating to the individual inmate. The *Ramirez* Court described the Board's argument as follows:

> The Board ... claims that 'due consideration' of [Ramirez's parole] application is demonstrated by the [Board's] references in its decision to the nature of Ramirez's crimes, his previous criminal record, his failure to correct his criminality ..., his unstable social history, his need for therapy, and his 'institutional programming.' The Board argues that 'some evidence' supported its findings, because the record before it was replete with evidence relating to the factors relied on in the decision. *Id.* at 568.

However, the court concluded that the Board's decision "...was arbitrary in the sense that the Board failed to apply the controlling legal principles to the facts before it" and that the lack of support for the findings "supports Ramirez's claim that his parole hearing was a sham." *Id.* at 571. *Penal Code* §3041 requires that the factors relied upon, and supported by some evidence, must be factors that indicate a legitimate concern that the prisoner currently poses a threat to public safety if released. *See In re Ernest Smith*, 114 Cal. App. 4th 343 (2003); see also *In re*

*Scott, supra,* 119 Cal. App. 4th at 890-892. The *Ramirez* Court acknowledged that there will always be "some evidence" to support a finding that a prisoner committed the underlying offense. Those facts alone, however, do not justify the denial of parole. Thus, while concluding that there was factual support for the findings as to the crime and priors, the *Ramirez* Court still found the Board's decision arbitrary since there had been multiple hearings, nine (9) years had passed beyond the minimum term, and it was seventeen (17) years after entering prison. *Id.* at 571. This was the first time that a court acknowledged that a finding could violate due process even though supported by "some evidence" in the record.[26]

Likewise, as the Ninth Circuit stated in *Biggs*, despite the fact that there may remain evidence to support a finding of egregiousness of the crime:

> A continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.

*Biggs, supra,* at 916-917.

At this point, it is well established that the caution set forth in *Biggs v. Terhune, supra,* is in fact the standard. The rule is simply that the passage of time depletes the probative value of immutable, crime-based evidence as establishing current dangerousness. At some point, the predictive value of the crime is nonexistent. Here, even assuming that the commitment offense was "heinous, atrocious or cruel" as intended by section 2402(c)(1), too much time has passed, and too many other relevant factors have intervened during Mr. Asbury' incarceration, effectively nullifying the predictive value of the offense to show current dangerousness.

The denial by the Board of Mr. Asbury' parole grant is precisely the event the *Biggs* Court forewarned. Unlike Mr. Biggs, Mr. Asbury faced his eighth parole hearing, and not his first. Moreover, unlike Mr. Biggs, Mr. Asbury was convicted of second degree murder, not first degree murder. Mr. Biggs served only fourteen (14) years of his sentence for first degree murder before being denied parole, *whereas Mr. Asbury has now served twenty eight (28) years on a second degree murder conviction.* Even as of the 2005 Board hearing, Petitioner had served over *15 years* above his designated matrix, and is now *19 years over..* Here, the only commonality between Biggs and Mr. Asbury is a dedication towards rehabilitation while

---

[26] The California Supreme Court has never disputed these aspects of the *Ramirez* decision, only criticizing it to the extent that it required a comparison with other crimes for proportionality purposes.

incarcerated. The continued reliance by the Board on the commitment offense under these circumstances has resulted in a due process violation.

In Mr. Asbury's case, the Board's unsuitability determination falls squarely within the scope of the above-mentioned cases. Such cases indicate that there is no litmus test as to the number of hearings that must occur before relief is appropriate, and no set pattern of behavior that must be met by the inmate to show rehabilitation, beyond the inmate serving his or her minimum term and showing positive evidence of rehabilitation. *Irons v. Carey [Irons II]*, 476 F.3d 658, 665 (9th Cir. 2007). It is the ***dramatic nature of the change undergone by the inmate that distances them from the crime***, not just temporally, but in the sense of no longer being the person who committed the offense, and no longer being subject to the issues that led to its commission. However, the one point that is simply beyond dispute is that Mr. Asbury has not just distanced himself from the crime temporally, but he has effectively dealt with every underlying issue that led him to commit the offense that the fact of its commission no longer has any meaning in assessing his current dangerousness, a rating that every professional assigns to the lowest possible level. Moreover, psychological clearances authorized by the CDC's own clinicians have ***repeatedly*** indicated that there are no psychological impediments to Mr. Asbury's parole.

The rules announced in *Biggs*, *Sass*, and *Irons II*[27] clarify the requisite nexus between the commitment offense and an inmate's current dangerousness in the context of parole denials. In *Irons II*, the Ninth Circuit stated, "[a]ll we held in those cases [*Biggs* and *Sass*] and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum term." *Irons v. Carey [Irons II]*, 476 F.3d 658, 665 (9th Cir. 2007). Although the Ninth Circuit concluded the petitioner in *Irons II* was not entitled to relief, the court did so based on the severity of his particular offense and the fact that he had not reached the end of his minimum term. *Id.* Immediately thereafter, the court specifically noted that

> [I]n *Sass* [*v. California Bd. of Prison Terms* 9th Cir. (2006) 461 F.3d 1123] and in the case before us there was substantial evidence in the record demonstrating rehabilitation. In both cases, the California Board of Prison Terms appeared to give little or no weight to this evidence in reaching its conclusion that Sass and Irons presently constituted a danger to society and thus were unsuitable for parole.

---

[27] *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123 (9th Cir. 2006); *Irons v. Carey [Irons II]* 476 F.3d 658 (9th Cir. 2007).

We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.

*Id.*, citing *Biggs, supra*, 334 F.3d at 917.

Thus, the Ninth Circuit made clear that once the inmate has passed his minimum term, as Mr. Asbury did *eighteen (18)* years ago, continued reliance on the commitment offense, despite clear evidence of rehabilitation can clearly violate an inmate's due process rights. See *Brown v. Kane* N.D. Cal. (2007) ___ F.Supp.2d ___ [2007 WL 1288448] slip opn., at p. 6, *Rosenkrantz VI, supra*, 444 F.Supp.2d 1063; *Martin v. Marshall* N.D. Cal. (2006) 431 F.Supp.2d 1038, *Thomas, supra; Sanchez, supra*, 444 F.Supp.2d 1049, *Scott II, supra*, 133 Cal.App.4th 573, 594-595; *Lee, supra*, 143 Cal.App.4th at 1409; *Elkins, supra*, 144 Cal.App.4th 475; *In re Barker* 151 Cal.App.4th 346, (2007); *In re Gray* 151 Cal.App.4th 379, (2007). Each of the above-referenced decisions shows that due process prohibits parole denial in the face of overwhelming evidence of rehabilitation where, due to the passage of time, there is no longer a nexus between the crime and the inmate's current level of dangerousness.

A discussion of the case of *In re Elkins* (2006) 144 Cal.App.4th 475 (2006) is instructive in this instance due, in part, to the type of offense. Elkins was convicted of first degree murder and robbery, with use of a deadly weapon, and was sentenced to twenty-five (25) years to life. 144 Cal.App.4th 475, 504. Elkins and the victim were high school classmates and drug dealing associates. *Id.* at 505. At the time of the offense Elkins was only nineteen (19) years old. *Id.* The victim owed Elkins money for drugs and was bludgeoned to death by Elkins, as he slept, with a baseball bat. *Id.* at 505-506. After the murder, Elkins took the victim's wallet, money and drugs, dumped his body down a steep grade, continued to steal from the victim's storage unit and his girlfriend's home over several days and then fled the state. *Id.* at 505.

In 2005, at his eleventh (11th) parole hearing, the Board concluded Elkins did "not pose an unreasonable risk of danger to society or public safety if released from prison." *Id.* at 507. Although the Board stated it was an "extremely vicious crime," they concluded the suitability factors outweighed the commitment offense. *Id.* The Governor subsequently reversed the Board's decision. *Id.* In rendering his decision, the Governor characterized the offense as "atrocious" and Elkins's actions after the murder as "cold and calculated." *Id.* 509-510. The Governor then claimed the gravity of the offense, alone, was sufficient for him to conclude

34

Elkins was an unreasonable risk to public safety. Although Elkins had been incarcerated for twenty-six 26 years and made "creditable gains," the Governor decided the offense outweighed all the positive factors supporting his release. *Id.* Specifically, the Governor's decision relied on two (2) factors: 1) Elkins's acceptance of full responsibility, over a decade ago, was too recent and 2) the gravity of the commitment offense. *Id.* at 515-517. The court, however, concluded that no minimum time requirement existed and instead found that acceptance of responsibility works in favor of release "'no matter how longstanding or recent it is,' so long as the inmate 'genuinely accepts responsibility.'" *Id.*, quoting *Lee, supra*, 143 Cal.App.4th 1400. With regard to the Governor's assertion that the offense "alone" was sufficient support for denial, the court noted that Elkins's ability to rob the victim without hitting him or hitting him just once does not shed light on whether the murder was "especially brutal." *Id.* While Elkin's actions may have shown an especially brutal robbery, they did not necessarily demonstrate an especially brutal *first degree murder. Id.* Accordingly, the court concluded the Governor could not rely on the fact that Elkins could have avoided the killing to show the murder was especially brutal, because such action could not be considered "more aggravated or violent than the minimum necessary to sustain a conviction for that offense." *Id.* citing *Scott II, supra*, 133 Cal.App.4th at 598.

Ultimately, the court concluded "[g]iven the lapse of 26 years and the exemplary rehabilitative gains made by Elkins over that time, continued reliance on these aggravating facts of the crime no longer amount to 'some evidence' supporting denial of parole." *Id.* In delivering its decision, the court discussed extensively *Rosenkrantz VI, Martin*, and *Irons*, focusing on the fact that continued reliance on unchanging circumstances, to deny parole, despite years of positive institutional behavior, has no predictive value, and thus, such reliance is a due process violation. *Id.* at 521-523. Thus, the Governor's reversal of the Board's grant of parole lacked "some evidence" that Elkins posed "an unreasonable risk of danger to society." *Id.* at 523, citations omitted.

Here, Mr. Asbury has similarly served a lengthy period of incarceration, over twenty eight (28) years on a second degree murder, yet his case poses an even more compelling basis for relief. First, Mr. Asbury, unlike Elkins, was convicted only of second degree murder. Second, Mr. Asbury was suffering from severe alcoholism at the time of the commitment offense. Like Elkins, Mr. Asbury has matured tremendously during his incarceration and has programmed in an exceptionally positive fashion. Most importantly, the use of Mr. Asbury' offense as a

35

1    predictor of current dangerousness is just as ineffective as it was in *Elkins*. Thus, reliance on

2    immutable factors to continually deny parole, at this point, is a clear due process violation.

3          Likewise, in the case of *Thomas v. Brown*, recently decided by this Court, the Ninth

4    Circuit's holding in *Sass* as it relates to *Biggs* was explained. *Thomas v. Brown, supra,*

5    ___F.Supp.___[2006 WL 3783555] (N.D.Cal. 2006).    This Court held that *Sass* "did not

6    dispute" *Biggs'* principle that the passage of time does in fact reduce the probative value of the

     commitment offense. *Id.* at p. 5. This Court clearly stated that the ***only*** way that *Sass* limits

7    *Biggs* was to do away with the notion that the commitment offense and pre-prison conduct could

8    only be used to deny parole at the first hearing. *Id.* This Court explained that the principle still

9    stood that the predictive value of the commitment offense to support the finding of unsuitability,

10   decreases with the age of the crime. *Id.* As such, any assertion that continued reliance on the

11   crime in this case is not a due process violation, considering the time lapse and clear proof of

     rehabilitation and outstanding programming, is without merit. This notion has been recognized

12   since the California Court of Appeal decision in the case of *In re Scott [Scott II]*, 133 Cal.App.4th

13   573, at 594-595 (2005) clarified the role of the passage of time and multiple denials in eventually

14   depleting the crime of any predictive value as to whether the inmate was currently dangerous.

15   When the California Supreme Court denied review of *Scott II*, and refused to de-publish the

16   decision or block that inmate's release, it started to become apparent that this was where the

17   focus should be when reviewing denials of parole.

18         In *Martin v. Marshall*, 431 F.Supp.2d 1038 (N.D. Cal. 2006), a double murder case,

19   parole applicant Martin was convicted of second-degree murder for shooting to death Acosta, a

     person with whom he shared a prior drug dealing relationship, killing one innocent bystander and

20   injuring another innocent bystander with the gunfire. *Id.* at 1040. As Acosta approached him in

21   a restaurant, Martin shot Acosta seven times, and continued firing the gun, resulting in the death

22   and injury to the bystanders. *Id.* He was sentenced to fifteen (15) years-to-life, plus a five (5)

23   year enhancement. *Id.* At his fifth parole hearing, twenty-three (23) years later, the Board

24   granted Martin parole. *Id.* at 1041. Governor Gray Davis reversed the grant of parole, stressing

25   in part the gravity of the offense that he found demonstrated a callous disregard for human life

     and lack of remorse. *Id.* To support this assertion, Governor Davis cited Martin's flight from the

26   scene without securing medical help, and his involvement with drugs at the time he committed

27   the offense. *Id.* at 1046.

28

                                        36

The court found that the Governor's reliance on the unchanging circumstances of the crime and pre-prison conduct as grounds to reverse the Board's decision violated Martin's right to due process. The court reasoned that Martin's offense was impulsive in part, he had exceeded his sentence by approximately six years, and he had exemplary behavior and evidence of rehabilitation. *Id.* at 1047. Given the static nature of the offense compared against the evidence of Martin's rehabilitation and behavior that indicated no present threat, the court found the commitment offense provided no evidence to support the Governor's reversal. Implicit in the court's reasoning was a theme expressed in other similar decisions: the commitment offense no longer possessed a predictive value of Martin's current threat to the community if released. Instead, like the other cases discussed herein, the court looked beyond the vacuum of the commitment offense to the length of time since the crime, the number of denials, and the parole applicant's behavior while in prison.

In *Sanchez v. Kane,* 444 F.Supp.2d 1049 (C.D. Cal. 2006), parole applicant Sanchez was convicted of one count of second-degree murder in 1989 and sentenced to sixteen (16) years-to-life. *Id.* at 1051. On May 5, 1988, Sanchez was involved in an argument with Gonzalez Ruiz, a member of "The Magicians Club" (the TMC gang), after Sanchez honked at Ruiz's girlfriend to get her attention. *Id.* After arguing with Sanchez, Ruiz got a steel bat and swung it at Sanchez, shattering his car window. *Id.* Later that evening, while at a Crazy Rider gang hangout, Sanchez stated he wanted revenge against the TMC gang. *Id.* Upon leaving, Sanchez got into his car with "Lazy" and drove to an apartment where another Crazy Rider lived. *Id.* Upon leaving the apartment, they had a bag containing a cut off 30/30 Winchester rifle. *Id.* Twenty (20) to thirty (30) minutes after Ruiz assaulted Sanchez, two shots were fired from Sanchez's car, near the scene of the prior assault. *Id.* at 1052. The victim, who was not a TMC gang member, was sitting in a car when he was shot in the head. *Id.*

On December 2, 2002, at his fourth parole consideration hearing after only fourteen (14) years of incarceration, the Board concluded that Sanchez "would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison." *Id.* at 1052-1053. However, former Governor Gray Davis reversed the Board's decision, giving several reasons, including in part: "(1) the callous nature and circumstances surrounding the commission of the crime; (2) petitioner demonstrates a lack of any remorse; (3) petitioner's continued minimization of his role in the murder..." *Id.* at 1054 and 1061. Noting that the Governor's finding that Sanchez minimized his role in the murder and denied gang involvement was taken from a 1989

Probation Report, rather than his statements at the hearing, the court concluded "some evidence" did not exist to support that finding. *Id.* Similarly, the court concluded the Governor's reliance on Sanchez's "lack of remorse" did not provide "some evidence" to support his finding since the Governor relied on immediate post-crime efforts to evade apprehension, while the Board relied on the Sanchez's current statements taking responsibility and indicating he was sorry. *Id.* at 1062. The court simply felt that remorse should be mutable over time. *Id.* Thus, "some evidence" did not support his conclusion. *Id.*

Finally, noting the Governor's statements that "[the crime] was a planned and calculated and cold-blooded murder demonstrating exceptionally callous disregard for human suffering...and it involved particularly egregious acts beyond the minimum necessary to sustain a conviction of second-degree murder," the court concluded that the nature of the offense was not "some evidence" of Sanchez's suitability, and as such, the Governor's reversal was a due process violation. *Id.* at 1063. In rendering its decision, the court extensively discussed the reasoning in *Biggs, supra. Id.* at 1062-1063. The Board, in determining Sanchez was suitable for parole, concluded that the circumstances surrounding the crime were "unchanging." *Id.* at 1062. Accordingly, the court explained that while "the Board or Governor is 'initially justified' in relying on the gravity of an inmate's offense in denying parole," however, continued reliance on unchanging factors, such as the commitment offense and conduct prior to imprisonment, "runs contrary to the rehabilitation goals espoused by the prison system and could result in a due process violation." *Id.*, citing *Biggs, supra*, 334 F.3d at 916-917.

In *Rosenkrantz VI, supra*, 444 F.Supp.2d 1063, the petitioner was sentenced to fifteen (15) years to life plus a two (2) year gun use enhancement for second-degree murder. *Rosenkrantz VI, supra*, 444 F.Supp.2d at 1065-1071. Rosenkrantz, a homosexual, was confronted by his brother and his brother's friend, Redmond, who wished to prove that Rosenkrantz was gay. (*Id.*) While Rosenkrantz was at the family beach house on Friday with friends, his brother and Redmond, kicked in the door, calling the occupants "faggots," struck Rosenkrantz with a flashlight breaking his nose, and burned his hands with a stun gun. *Id.* Rosenkrantz's father was then told that he was homosexual, causing the father to kick him out of the house. *Id.* Three days after the incident at the beach house, Rosenkrantz went to a shooting range where he rented an Uzi semiautomatic, nine-millimeter carbine gun, and contemplated committing suicide. *Id.* at 1072. He ordered an Uzi from a sporting goods store on Monday that would be ready for pick-up on Wednesday.

38

On Tuesday, Rosenkrantz went to work, where he informed one coworker that he had purchased a gun and planned to kill his brother. *Id.* He also told another coworker that his brother and Redman had humiliated him, and that he was obtaining a gun. *Id.* Rosenkrantz picked up the gun on Wednesday, and purchased 250 rounds of ammunition. (*Id.*) On Thursday night, Rosenkrantz went to the condominium complex where Redmond lived, and attempted to locate his car. *Id.* Unable to locate his car, Rosenkrantz slept in his car overnight near the complex, waiting for Redmond to exit, and when he did, Rosenkrantz blocked him with his car, and after a brief exchange where Redmond refused to recant his statements that he made to Rosenkrantz's father, he shot him at least ten (10) times, including six (6) wounds to the victim's head. *Id.* Rosenkrantz fled for approximately one month before turning himself in. *Id.* at 1073.[28]

Rosenkrantz' habeas challenge in the United States District Court was based on his subsequent 2004 parole suitability hearing, where the Board found him unsuitable solely on the gravity of his commitment offense. *Id.* at 1070-1071. Rosenkrantz had served just under twenty (20) years in prison, had not committed any violent acts while in custody, earned a B.S. in computer science, completed all therapy and self-help programs that were available, received excellent work reports and opinions from correctional counselors that he presented no more of a risk to the community than the average person. *Id.* at 1065-1066. He had realistic parole plans, familial and community support, and the trial judge, various legislators, the arresting officer and the victim's only living relative all supported his release. *Id.*

Relying on *Biggs* and *Scott II*, the *Rosenkrantz VI* court made two points. "First, continued reliance upon the unchanging facts of petitioner's crime makes a sham of California's parole system and amounts to an arbitrary denial of petitioner's liberty interest." *Id.* at 1082. The *Rosenkrantz* court held that the Board's choice to ignore two decades of positive programming in favor of immutable facts was an arbitrary and capricious method of converting a minimum term into a life without parole sentence. Second, the court concluded the predictive values of the crime was so diminished that it could not serve as "some evidence" to support the Board's finding of parole unsuitability. As the Court noted,

> While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such

---

[28] The details of this crime, which contained more facts showing significant evidence of premeditation, lying in wait and an execution style manner of killing, are also discussed in *Rosenkrantz V, supra*, 29 Cal.4[th] at 627-630.

unchanging circumstances-after nearly two decades of incarceration and half a dozen parole suitability hearings-violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the "some evidence" standard. *After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil.*

*Id.* at 15 citing *Johnson v. Finn*, 2006 WL 195159, (E.D. Cal. 2006) ["[T]he seriousness of the crime had predictive value for the dangerousness of petitioner's release for the first, second, perhaps third suitability hearing. But as the years go by, this factor loses its predictive value in light of the growing experience to the contrary (assuming petitioner's record in prison is exemplary)"].

Collectively, these rulings establish that the probative value of the crime as evidence establishing current dangerousness diminishes over time, eventually becoming legally non-existent, where it can no longer satisfy the "some evidence" standard. In sum, due process precludes continuous denials in the face of overwhelming evidence of rehabilitation, and where the passage of time forecloses any established nexus between the crime and an inmate's current level of dangerousness. Accordingly, the Board in this case failed to address the appropriate legal concepts governing parole decisions under the United States Constitution. To allow this to continue is to allow parole denials that are entirely politically motivated and pretextual in nature. Mr. Asbury' commitment offense happened *twenty eight (28) years ago*. He has sustained *eight (8) parole* denials. He has remained disciplinary free, as he has since 1993, completed numerous college courses, is assigned to the Vocational Computer Repair program as a teacher's aide, and participating in both Alcoholics Anonymous and Narcotics Anonymous. App. A, Exh. A, p. 10, see also App. A, Exh. C. Numerous psychological evaluations document the role that Mr. Asbury's heavily intoxicated state, rather than violent nature, played in the commission of the instant offense. . His most recent complete psychological evaluation in 2004 advised the Board that Mr. Asbury's alcohol dependence is in sustained full remission, he is competent and responsible for his behavior, there is no evidence of the presence of sociopathy, and that if released to the community his *risk for future violence potential appears to be no greater than the average citizen* provided he remain substance free. App. A, Ex. C pp. 338-341, emphasis added. Lastly, Mr. Asbury' parole plans are extensive and solid. Mr. Asbury has very stable and realistic parole plans. He has a residence, a wife, a supportive community of friends and employment all awaiting his release. In order to reacclimatize himself to society, Mr. Asbury

1   plans to check into an out-patient therapy program at the Veterans Administration Hospital in
2   Livermore. (App. A, Exh. E p. 346.) Cognizant of the need to continue treatment in order to
3   remain abstinent from alcohol, Mr. Asbury also plans to enroll in his local Alcoholics
4   Anonymous program. (*Id.*)

### 3. *Summary*

6       Courts at both the State and Federal level are no longer permitting the Board to deny parole
7   based solely on the commitment offense when it can no longer indicate present dangerousness,
8   especially when juxtaposed against subsequent years of incarceration.   It simply offers no
9   evidence of current dangerousness.  Although no bright line rule exists specifying the exact
10  number of hearings or exactly how much time must pass before the commitment offense is no
11  longer an effective predictor of future dangerousness, a greater proof of rehabilitation decreases
12  the number of hearings and passage of time required to draw such a conclusion.  In the federal
13  system, because of the overlay of the Antiterrorism & Effective Death Penalty Act (AEDPA), 28
14  *U.S.C.* §2254, those courts must evaluate whether the state court decision is an unreasonable
15  application of clearly established federal law as announced by the United States Supreme Court.
16  In this context, the rule has developed in federal habeas that the inmate must be beyond his or
17  her minimum term for a due process violation to occur.  *Irons II, supra*, 476 F.3d at 665;
    *Hayward, supra*, at 10.
18
19      That missing nexus to current dangerousness exists in Mr. Asbury' case as well.  Clearly,
20  the crime was situational, a one time act, founded on extreme alcoholism.    Numerous
21  psychological evaluations document the role that Mr. Asbury's heavily intoxicated state, rather
22  than violent nature, played in the commission of the instant offense.  The extensive history of
23  multiple psychological reports show these issues to be fully resolved, with the doctors
24  unequivocally concluding that Mr. Asbury poses no appreciable risk of danger if released.  He
25  has done everything he can since committing this offense to rehabilitate himself.  Therefore, just
26  as in each of the cases listed above, there is no connection between Mr. Asbury' offense and his
    present dangerousness, particularly in light of over twenty eight (28) years of time served. As
    such, the Board's decision to deny Mr. Asbury' parole was ill-founded.

IV.   *THE BOARD ABUSED ITS DISCRETION WHEN IT FOUND PETITIONER WOULD POSE AN UNREASONABLE RISK OF DANGER TO SOCIETY IF RELEASED WHEN BY THE BOARD'S OWN RULES THAT FINDING WAS NOT SUPPORTED BY THE EVIDENCE.*

Petitioner's claim herein finds sufficient support without even having to go through the extensive legal arguments usually presented in these parole cases, because when the Board's own rules are examined, it is clear that Petitioner is suitable for parole and there is *no evidence* to support a finding that he would pose an unreasonable risk of danger to the public if released. *Cal. Code of Regs.*, tit. 15 §2402(a).   One need only examine the criteria established by the Board itself, *Cal. Code of Regs.*, tit. 15 §2402(c) & (d) to see that the Board violated Mr. Asbury's due process right to a parole release date at the hearing held on January 5, 2005. Mr. Asbury had an expectation that a parole date would be set, and the burden was on the Board to establish evidence to support a finding that he would currently pose an unreasonable risk of danger to the public if released. *McQuillion I, supra,* 306 F.3d 896, 902. That burden simply was not met.

There can never be a situation where the CDCR and BPH have *less* evidence indicating that Mr. Asbury poses any threat to the public than was presented to the Board at his *eighth* hearing.   All current and relevant evaluations concluded that Mr. Asbury's post-conviction behavior indicates a changed man, not unlike that contemplated in the Ninth Circuit decision in *Biggs, v. Terhune, supra.*   The California Court of Appeal, First District, recently stressed the imperativeness of applying all of the regulatory criteria indicative of suitability.   The Court explained:

> "The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence'). Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair (citation omitted), and runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (*In re Scott* (Scott II), 133 Cal.App.4[th] 573, 584 (2005) [citing *Biggs v. Terhune, supra,* 334 F.3d at 917.]) "The commitment offense can negate suitability on if circumstances of the crime reliably established by the evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time." (*Id.*)

Still, here, the Board ignored all of the evidence, regulatory factors and expert

42

evaluations and ignored its obligation to set a term and future release date. By so doing, the Board has in effect illegally converted Petitioner's sentence to life without possibility of parole (LWOP).[29] If the Board is permitted to continue to deny parole based on the immutable factors of the crime itself, and Mr. Asbury's behavior prior to incarceration for this offense, then the Board could continue to deny parole forever as those circumstances will never change. This would, in effect, convert Mr. Asbury's sentence to LWOP, a sentence not prescribed by the legislature for Mr. Asbury's crime of second degree murder. It would also ignore Mr. Asbury's achievement in attaining the goal of rehabilitation, and violate the due process rules enunciated in *Biggs*, *supra*, at 915-916.

After years of litigation against the parole granting authority in the 1970's, not unlike the unprecedented litigation now seen in the state and federal courts, the California Supreme Court decided that the abuses could no longer continue and that Court issued what is certainly the most broad, sweeping changes in the history of California incarceration. These changes were all brought to pass by the runaway abuses of the then Adult Authority.[30] The Court found that all too often, prisoners were not found suitable for parole and given a release date until *after* they had already served a term in excess of what the Board ultimately calculated the appropriate term of incarceration to be. In stating in part its reason for the decision in the case of In *In re Rodriguez*, (1975) 14 Cal.3d 639 (1975), and in particular its command that the Board promptly set the term and proposed release dates for offenders, which ultimately became the reason for SB42 (the Uniform Determinate Sentence Act), the Court stated:

> Prompt term-fixing will not only serve to alleviate one of the causes of anxiety now affecting inmates, but will also prevent the intrusion of irrelevant, post-conviction factors into the determination of the punishment that is proportionate to the offense of the particular inmate. Prompt term-fixing will also enable the inmate who is aggrieved by what he believes to be an unconstitutionally excessive term to seek judicial review of the action by the Authority. ....
>
> Prompt term-fixing will not only relieve the courts of the burden of reviewing repeated complaints by prisoners whose terms have not been fixed, but will

---

[29] "For purposes of assessing the constitutional proportionality of an inmate's term, the court will deem it to have been fixed at the maximum if the Authority does not act promptly to fix the primary term of a prisoner committed to the Department of Corrections to serve an indeterminate sentence. [Citation.]" In *In re Rodriguez*, (1975) 14 Cal.3d 639 at 654 (1975).

[30] Until July 1, 1977, the Adult Authority was the entity charged with determining parole for indeterminate-sentenced offenders in California. Upon the enactment of the DSL, that power was vested in the Community Release Board, and in 1978 that entity was rename the Board of Prison Terms, and effective July 1, 2005, the Board of Parole Hearings.

43

also make possible the type of meaningful review of Authority actions to which prisoners are entitled. . . . (*In re Rodriguez* 14 Cal.3rd 639, 654, fn 18; 122 Cal.Rptr. 552 (1975).)

The Legislature followed this dictate when it enacted *Penal Code* §3041 to provide that a parole release date "shall normally" be set at the *initial* hearing. *Penal Code* §3041(a). A long line of subsequent case law has defined a bright line that absent evidence that an offender poses a current threat of future violence, the Board has an obligation and duty to set a term and set a parole release date for that offender at his initial hearing. *In re Ramirez, supra,* 94 Cal.App.4th 549; *Rosenkrantz II, supra,* 80 Cal. App.4th 409; *Rosenkrantz V, supra,* 29 Cal.4th 616; *In re Morrall, supra,* 102 Cal.App.4th 280; *Biggs v. Terhune, supra,* 334 F.3d 910; *In re [Mark] Smith,* 109 Cal.App.4th 489 (2003); *In re [Ernest] Smith,* 114 Cal.App.4th 343 (2003).) Based on this well-established principle, Mr. Asbury was not entitled to a grant of actual release at his *initial* hearing, but he was entitled to have a term established and a tentative release date set so that he, his loved ones, and all concerned parties would know when he would be going home, unless his behavior or psychological condition deteriorated so as to cause that grant of parole to be rescinded. Here Mr. Asbury has been denied repeatedly at each of his *eight* parole suitability hearings. The Board's action in repeatedly denying Mr. Asbury a tentative release date demonstrates the Board's failure to comply with the obligations set forth in *Penal Code* §3041.

It is also now well established that California *Penal Code* §3041 creates a protected liberty interest that gives Petitioner an expectation that parole will be granted. See *McQuillion I, supra,* and *In re Dannenberg, supra.* One need only examine the criteria established by the Board itself in *Cal. Code of Regs.,* tit. 15 §2402(c) & (d) to see that the Board violated Mr. Asbury's due process right to a parole release date at the hearing held on January 5, 2005. To defer declaring the appropriate term for Mr. Asbury's crime and set a tentative parole release date, the burden was on the Board to point to evidence to support a finding that he currently poses a threat to the public. *McQuillion I, supra,* 306 F.3d 896, 902.

The Board has guidelines for determining if a prisoner would pose an "unreasonable risk of danger to society" if released. These rules must comport with the authority given it by *Penal Code* §3041 and may not be more onerous nor restrictive than the authorizing statute. See *In re Ramirez,* 94 Cal.App.4th 549, 560 (2001), ["[T]he Legislature which amended *Penal Code* section 3041 in 1976, clearly contemplated that the executive branch's exercise of its broad discretion over parole decisions would conform with factors prescribed by law." In short, the

44

Board is to consider factors that tend to indicate one's dangerousness, which when weighed against factors which tend to indicate that he is suitable for parole, establish an unreasonable risk, not just any risk, of danger.

The *Ramirez* approach is a common sense one. All murders show disregard for human life, as any killing without justification or excuse, by definition is done without regard for, and in disregard of, human life. However, as recognized by the *Ramirez* court, and the progeny of cases thereafter, the Legislature has commanded that in the cases of all non-special circumstance murders, a tentative release date "shall normally" be set at the inmate's *initial* hearing. Absent facts that make the offense "particularly egregious," it does not make sense to use the circumstances of that crime to hold a prisoner beyond the term prescribed by law under the Matrix (*Cal. Code Regs.*, tit. 15 §2282(a)), when it is the circumstances of the offense that went into making the matrix in the first place. See *Little v. Hadden*, 504 F.Supp. 558, 562 (1980) ["It is simply irrational for seriousness of the offense to be used first to determine the appropriate [matrix] period and then to be used again as the stated reason for confining a person beyond that guideline.' [Citations.]".) *Ramirez* stands for the principle that, absent "particularly egregious circumstances of an individual crime, the term served by an offender should not be more than the term prescribed for the offense for which he stands convicted. Although the death of another human being is always a tragedy, the Court can not lose sight of the fact that Mr. Asbury was convicted of second-degree murder, and therefore, by law, it has been found there was no premeditation or deliberation. This crime does not rise to the level of those for which a parole release date can be denied, based solely on that crime. That type of denial is reserved for only the most serious cases, such as the special circumstances first degree murder addressed in *In re Van Houten*, 116 Cal.App.4th 339 (2004), wherein the victim was stabbed more than 35 times, while she was tormented with the knowledge that her husband was experiencing the same fate in the adjacent room. See also *In re [Ernest] Smith, supra*. This case, correctly found by the jury to be no more than second degree murder, simply *cannot be* held to be beyond the standards described in *In re [Ernest] Smith, supra*, and *In re Van Houten, supra*.

When all of the factors of Mr. Asbury's case are considered in earnest,[31] it is clear that the decision not to conform with the dictates of *Penal Code* §3041(a) was made based on factors outside the scope of that statute or the Board regulations themselves and that that decision

---

[31] *Cal. Code Regs.* tit. 15 §2402(a)&(b) (Determination of Suitability) provide the overall scope of the Board's duty to determine a parole release date as follows:

constitutes an arbitrary, and thus unconstitutional, application of the law by the Board in violation of Mr. Asbury's right to due process.

**The Factors of Unsuitability**

In announcing its decision not to comply with the rule legislated in *Penal Code* §3041(a) at Mr. Asbury's eighth hearing, the Panel relied on one primary factor that will and can never change: i.e. the crime itself, pursuant to *Cal. Code Regs.* tit. 15 §2402(c)(1). The Panel apparently also relied to some degree on another factor that can never change, i.e. its' finding that Mr. Asbury's social history was unstable due to his alcohol and substance abuse, pursuant to *Cal. Code Regs.* tit. 15 §2402(c)(3). As will be seen below, the real reason relied on by the Board was the commitment offense itself. Although the *Dannenberg* Court purports to do away with the comparison of the offense with other crimes, as a matter of federal due process such a comparison is necessary to protect the right to proportional terms. In order to ensure that the exception does not swallow the rule, the commitment offense must be "***particularly egregious*** to justify the denial of a parole date." *Ramirez*, 94 Cal. App. 4th at 570, emphasis added; see also *In re Morrall*, supra, 125 Cal.Rptr.2d at 409. ["The Board's regulation indicates that the commitment offense will tend to indicate unsuitability for parole *if it was committed in an especially heinous, atrocious, or cruel manner*."] emphasis added.) Accordingly, "the Board must weigh the inmate's criminal conduct not against ordinary social norms, but against other instances of the same crime or crimes." *Ramirez*, 94 Cal. 4th at 570. Otherwise, it would be impossible to determine if it was "especially heinous" or "exceptionally callous." Mr. Asbury's commitment offense cannot reasonably constitute a crime among the gravest and most "egregious" of offenses when the offense involved no premeditation or deliberation. In the case of *In re Scott*, the court found that a defendant who shot his wife's lover to death in front of her and their son did not constitute a "particularly egregious crime". See *In re Scott, supra,* 119 Cal. App. 4th at 890-92; *Scott II, supra,* 133 Cal.App.4th 573. Similarly, in *In re Ernest Smith,* 114 Cal.App.4th 343 (2003), the court found that a murder stemming from defendant shooting his spouse three times in the head while her parents were in the next room, did not constitute a "particularly egregious" crime. See *In re Ernest Smith,* 114 Cal.App.4th 343 (2003).

The primary constitutional violation committed when the Board refuses to perform its *Penal Code* §3041(a) obligation at the initial hearing and does so based solely on the commitment offense itself, is that in doing so, the Board usurps the balance of powers prescribed by the state and federal constitutions. The Executive Branch, of which the Board is part, has no

46

authority to prescribe its own level of punishment for crime. The Legislature prescribes it and the judiciary imposes it. In the cases of indeterminate-sentenced individuals such as Petitioner, the Executive Branch determines the actual term of incarceration, but it must do so within the guidelines prescribed by the Legislature. If the Board is allowed to forever deny parole based solely on the commitment offense, with no other evidence upon which to make a finding of current dangerousness of the offender, then the Board is allowed to effectively convert the sentence from one of life with the possibility of parole after a minimum term and consistent with the matrix of uniform terms established for the individual's offense, to one of life without parole (LWOP). The circumstances of the crime will never change. The Legislature has listed the crimes that carry a sentence of LWOP, and for an offender to be sentenced to such a term, the special elements of that greater crime *must* be pled and proven to a trier of fact. (See *Apprendi, supra,* and *Blakely, supra.*) The life top is not meant for the offender who commits a murder and then turns his or her life around in prison. It is for the offender that does not change, coming to prison and acting in ways that show a continuing danger to public safety

This is not a complicated concept that our Constitution created. Put very simply, when the Legislature says a crime *must* possess certain legal elements before it can be subject to a sentence of *life without possibility of parole* based solely on a conviction of the commitment offense itself, the Board *cannot,* circumvent the tripartite balance of powers and effectively convert the term of an offender convicted of a *lesser* crime, without those necessary elements, to LWOP by taking the position that it (the Board) can forever deny parole based solely on the fact that the offender committed the offense, an offense for which *the Legislature specifically precluded* a sentence of LWOP. The Board's action in denying parole based solely on the offense, when the Legislature did not authorize LWOP for the circumstances or elements of that crime, is a clear constitutional violation of the *separation of powers*.

Nor can the Board insulate itself from this finding of unconstitutionality by taking the position that it is only denying parole this one time, and "maybe" the offender will be found suitable at a subsequent hearing. The constitutional violation occurs when the Board *denies parole* based solely on the offense, for to make that permissible one time without the necessary evidence of current dangerousness makes it permissible forever. The circumstances of the offense can never change. If the Legislature prescribed a sentence of life *with* possibility of parole, and mandated the Board to set a matrix to assure uniform terms for the same crime (e.g. second degree murder) under similar circumstances, then "It is simply irrational for seriousness

47

of the offense to be used first to determine the appropriate [matrix] period and then to be used again as the stated reason for confining a person beyond that guideline.' [Citations.]" (*Little v. Hadden,* 504 F.Supp. 558, 562 (1980).)

While the instant offense is admittedly very serious and tragic, this is not a crime that meets the criteria of being "especially violent and brutal" like the intentional, savage killing described by the court in *In re Van Houten,* 116 Cal.App.4th 339 (2004) [10 Cal.Rptr.3d 406], which the court in *In re Scott,* 119 Cal.App.4th 871, 892 (2004), found "illustrates the sort of *gratuitous cruelty required*" to deny parole over an extended period of time, or that warrants a sentence of life without possibility of parole (LWOP). In *Van Houten, supra,* "the prisoner was involved in multiple stabbings of a woman with a knife and bayonet. While she was dying, the victim was made aware her husband was suffering a similarly gruesome fate. As stated by the court, "[t]hese acts of cruelty far exceeded the minimum necessary to stab a victim to death." *Id.* at 351; see also *In re Scott, supra,* 892. There can be no doubt of the intent to commit brutal, first degree murder in the Manson killings. Unfortunately, the Board does not distinguish between the savage, planned and intentional first degree murder demonstrated in *Van Houten* and the killing committed while under the influence of alcohol, without premeditation or deliberation, by Mr. Asbury in the case at bar. In fact, all murders are gravely serious, and yet the Legislature has mandated that parole "normally" be granted in those cases. See *In re Ramirez, supra,* 94 Cal.App.4th 549, 570, ["All violent crime demonstrates the perpetrator's potential for posing a grave risk to public safety, yet parole is mandatory for violent felons serving determinate sentences. *Pen. Code, §3000,* subd. (b)(1). Additionally, the Legislature has clearly expressed its intent that when murderers - who are the great majority of inmates serving indeterminate sentences - approach their minimum eligible parole date, the Board 'shall normally set a parole release date.' [Citation.] The Board's authority to make an exception based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted."])

There is nothing anywhere in the record that supports a finding that this offense was "especially heinous, atrocious or cruel" for the crime of second degree murder. Nor is evidence presented to support a finding that Petitioner is *currently* dangerous by the 2005 Board Panel's application of §2402(c)(1) in arbitrarily stating the crime was brutal and cruel. (App. A. Exh. B p. 329.) All murder is gravely serious. See *In re Rosenkrantz,* 80 Cal.App.4th 409, 425 (2000) [broadly characterizing the crime as cruel, callous or disregard for human suffering could be

48

applied to any murder and does not give consideration to the individual offense].)

The Board's finding that this crime was "brutal" and "cruel" and failure to set a parole release date is precisely why it is necessary for this Court to step in and protect the due process rights of Petitioner. The facts of the case are clear that this killing was not premeditated, but was the result of Mr. Asbury's inability to control his actions while intoxicated. Yet, in finding Mr. Asbury unsuitable for parole, the Board failed to address the full criterion. Instead, the Board used phraseology identical to the terms "dispassionate" and "cruel" without considering the balance of the relevant section. Under *Cal. Code Regs.*, tit. 15, §2402(c)(1)(B), this criterion requires a determination that the "offense was carried out in a dispassionate and calculated manner, *such as an execution style murder*." (Emphasis added.) Obviously, that terminology has no application to a case such as this. Instead, it is designed for a murder that occurs in a distinct factual pattern, one showing a particular dangerousness on the part of the defendant who commits an act of executing a victim. Exh. L. No such actions occurred factually in this case. Accordingly, that finding was wholly unsupported by the evidence.

As an additional factor to support the denial of parole, the Board relied upon a wholly misapplied and unsupported "finding." In fact, the Board's determination does not even comport with the requirements of the Board's own rules as a circumstances tending to show unsuitability. The Board half-heartedly applied §2402(3), Unstable Social History, in support of their decision. Section 2403(c)(3) provides as a circumstances tending to show unsuitability, "The prisoner has a history of unstable or tumultuous relationships with others." In announcing the Panel's decision, Presiding Commissioner Lawin stated: "the inmate had a substantial history of drug abuse [and] alcohol abuse." (Exh. B p. 332.) This is grossly wrong on two fronts. First, Mr. Asbury's social history in no way meets the Board's own criteria, which defines it as a tumultuous history with others. See *Cal. Code Regs.* § 2402(c)(3). In fact, the evidence is to the contrary. Petitioner does have a stable social history as evidenced by his enduring marriage and his relationships with others as demonstrated by his multiple support letters and pattern of positive programming in prison. As recently held by the District Court, "[t]hat petitioner came from a dysfunctional family and had an abusive father was not petitioner's doing. The court does not find that petitioner's family background demonstrates petitioner's inability to have stable relationships." *In re Bair*, WL 3081634 at pp. 15-16 (E.D. Cal 2005). Furthermore, as stated by the Ninth Circuit, there is no evidence of an unstable social history, as such finding would have to be based

49

upon continued instability during the time Petitioner was incarcerated. *Biggs v. Terhune, supra,* 334, F.3d at 916.

Second, drug addiction is not a factor tending to show unsuitability. *Cal. Code Regs.*, tit. 15, §§ 2402, 2281. As such, the Board's reliance on his "need" for more substance abuse therapy due to his addiction is contrary to the holding of *Thompson v. Davis,* 282 F.3d 780 (9th Cir. 2002), where the Ninth Circuit, recognizing that drug addiction is an established disability under the Americans with Disabilities Act (42 *U.S.C.A.* § 12102(2); 28 *C.F.R.* § 35.104), ordered that the Board may not discriminate against life term inmates who are recovering addicts or alcoholics by excluding them from parole. As such, a person with a disability encompassed within the protections of the ADA is afforded protection against discrimination. "[T]he plain language of the ADA extends its antidiscrimination guarantees to the parole context." (*Id.*) While an individual who is still engaging in the illicit activities of substance abuse is not afforded the protection against having his or her addiction and behavior weighed against him in parole matters, "the ADA does protect individuals who have successfully completed or are participating in a supervised drug rehabilitation program and are no longer using illegal drugs." (*Id.* at 784.) Here, it is evidenced through multiple psychological evaluations that Mr. Asbury is in full alcohol remission.

This rule precludes the Board from using Mr. Asbury's prior history of substance abuse against him in determining his suitability for release. It is well documented that Mr. Asbury has remained abstinent from drug abuse and any disciplinaries related to controlled substances for seventeen (17) years, even though he has been living in an environment where virtually any kind of drugs, as well as alcohol, are readily available. Exh. C p. 340. Mr. Asbury has attended numerous Alcoholics Anonymous classes and continues his self-study while on the waitlist to return to structured classes. Mr. Asbury's pre-incarceration history of substance abuse is an immutable factor that is negated by his post-conviction behavior and the protections afforded him by the ADA. Under these circumstances, it is a violation of due process and the provisions of the ADA to continue to use this unchangeable factor against him. See *Biggs v. Terhune, supra,* 334 F.3d at 917 ["A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."]. Certainly, if the Legislature had intended that these *immutable* factors alone were sufficient to keep Mr. Asbury incarcerated forever, it would have enacted legislation designed to achieve that result,

50

but it did not.

While it is true that the record shows that substance abuse played a substantial role in the instant offense, it is equally clear that Mr. Asbury has taken the steps on his own volition, to reform and recover from the grip of the substances that impaired his judgment so severely that it led to the commitment offense.

For the record, none of the other factors of unsuitability prescribed under *Cal. Code Regs.*, tit. 15 §2402(c) apply either, nor did the Board attempt to rely on any other factor. As defined by the Board, other circumstances that tend to show unsuitability include:

> "(2) Previous record of violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age (3) Unstable social history. The prisoner has a history of unstable or tumultuous relationships with others (4) sadistic sexual offenses...(5) Psychological factors. The prisoner has a lengthy history of severe mental problems related to the offense. (6) Institutional behavior. The prisoner has engaged in serious misconduct in prison or jail."

As discussed above, none of these factors are applicable in Mr. Asbury's case.

In short, the basis for the Board's decision, if allowed to stand, would justify denying parole to Mr. Asbury for the rest of his life, no matter how well he conducts himself during his continued incarceration. This would effectively be allowing the Board to make a unilateral finding of guilt of a parole-ineligible offense, contrary to the actual jury verdict, which is a direct violation of Mr. Asbury's Sixth Amendment right to a jury trial. See *Blakely v. Washington, supra*, 542 U.S. 296; see also *Apprendi v. New Jersey* 530 U.S. 466 (2000).

**The Factors of Suitability**

Section 2402(d) lists the Board's nine (9) "circumstances tending to show suitability." Although the Board may have played "lip service" to Mr. Asbury's substantial efforts of rehabilitation, the Board did not discuss these criteria; much less discuss them in earnest, even though even a cursory reading reveals eight (8) of the nine (9) criteria for suitability clearly apply to the circumstances of Mr. Asbury's case. *Cal. Code Regs.* §§ 2402(d)(1) and (6) provide that if a prisoner did not "have a record of assaulting" or causing "personal harm to" others, and if "the prisoner lacks any significant history of violent crime," those are two (2) criteria supporting *suitability*. First, Mr. Asbury does not have a history of violence, thus this factor clearly supports suitability. In the decision, the Board does not mention Mr. Asbury's non-violent criminal record other than to explain why Mr. Asbury needs to continue self-help treatment. The decision

1    describes Mr. Asbury's history as being "completely and utterly joined with his substance abuse

2    history." Exh. B p. 333. Mr. Asbury's prior crimes are not crimes of violence. The majority are

3    DUI charges. Also notable is the fact that Mr. Asbury has never received a disciplinary for a

4    significant violent behavior. Exh. B p. 340. Mr. Asbury's criminal history is not a "significant

5    history," of the type described in §§2402(d)(1) and (6). Therefore, the Board *must* apply these

     two sections in favor of suitability.

6        Section 2402(d)(2) provides "The Prisoner has experienced reasonably stable

7    relationships with others" as an indictor of suitability for parole. Presiding Commissioner Lawin

8    recognized Mr. Asbury's stable relationships with others when she stated to Mr. Asbury, "your

9    wife has been a long-time supporter of you for over 20 years and that you've been married."

10   Exh. B p. 332. In the decision the Board makes no note of the letters of support received on

11   behalf of Mr. Asbury from friends and potential employers. The stability of Mr. Asbury's social

12   connections is clearly documented in those letters. Furthermore, Mr. Asbury's suitability under

13   this factor is demonstrated by his excellent rapport with all members of CDC staff, including

     custody, counseling, and non-custody (known as "free") staff. Exh. A p. 23. The Board's failure

14   to apply this criteria to Petitioner is a clear violation of due process.

15       Section 2402(d)(3) acknowledges identifies the prisoner's remorse as a factor tending to

16   show suitability. Mr. Asbury's remorse has been well documented. This documentation shows

17   Mr. Asbury has a full understanding of his responsibility in the underlying offense. The

18   honorable Darlene Schempp, Judge of the Los Angeles County Superior Court submitted the

19   following comment to the Board for Mr. Asbury's January, 1989 hearing: "Mr. Asbury was a

     very courteous and seemingly remorseful defendant during the murder trial in my court." Exh. A

20   p. 25. In the report prepared for his initial parole consideration hearing, Mr. Asbury was quoted

21   stating: "I'm sorry that the man is dead, I'm sorry for his family..." Exh. A p. 19. Each and

22   every subsequent report documents Mr. Asbury accepts responsibility for his actions, does not

23   try to shift blame, and expresses remorse over the events which occurred and the death of Mr.

24   Jackson. The Board's was clearly obligated to apply this factor in favor of suitability.

25       Section 2402(d)(4) acknowledges "The prisoner committed his crime as the result of

26   significant stress in his life, especially if the stress had built over a long period of time" as a

     factor of suitability. At the time of this offense, Mr. Asbury had been under the continuous

27   influence of either alcohol or drugs, or both, and suffered the impaired judgment that led him to

28   commit this crime. Dr. Reed notes "[Mr. Asbury] has a highly significant substance abuse

                                              52

history, and substance abuse is also related to the instant offense." Exh. C p. 340. Mr. Asbury had been suffering from addition for many years at the time of the instant offense. The fact that he has no history of violent behavior indicates how this incident was the result of his addiction, not because he is an inherently violent person. By remaining disciplinary free since 1993, Mr. Asbury has proven that he now possesses the capacity avoid stress or handle stress in a mature manner whenever necessary, without resorting to substance abuse or violence. The Board failed to apply the facts as they relate to the circumstances of this case.

Section 2402(d)(7) lists "Age" as a factor that "reduces the probability of recidivism." Mr. Asbury is almost 55 years old and has been incarcerated since he was 28 years old. Studies show that recidivism dramatically reduces for offenders over the age of 40. This factor is applicable to Mr. Asbury, and should have been applied by the Board as a factor indicating suitability for parole.

Despite the fact that the Parole and Community Services Division Memorandum indicates that having a place to live or work does not have a bearing on ones release to parole, Section 2402(d)(8) lists "The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release" as an indication of suitability. Mr. Asbury's has fulfilled this requirement, and his plans for the future are excellent. The Board itself recognized that Mr. Asbury has a job offer and stable long-term relationship with his wife. Exh. B, p. 332. Mr. Asbury plans to live with his wife in Livermore, California after his release. Exh. E p. 346. In addition to a job offer from Mr. Gradia, president of United Textiles, Mr. Asbury has developed additional marketable skills during his incarceration. This is documented in the Board's commendations to Mr. Asbury, but does not appear to have weighed into their decision. Exh. B, 333-334. Petitioner has great support in every respect imaginable, including residence, employment, and emotional support. The 2003 Life Prisoner Evaluation Report summarized Mr. Asbury's parole plans as follows: "I believe that *Asbury's plans are solid in residence and very promising in employment*. ... As long as he abstains from any alcohol indulgence, *he should succeed upon release*." Exh. A p. 10, emphasis added. The Board's failure to recognize this factors showing suitability is further evidence of their denial of Mr. Asbury's right to due process.

Finally, Mr. Asbury's institutional behavior (§2402(d)(9)) indicates his ability to refrain from alcohol and drugs and all other significant misbehavior. Although he received eight CDC 115's none were for significant violent behavior. Since 1993 Mr. Asbury has remained

completely disciplinary free. By no imaginable stretch can Mr. Asbury's antiquated 115's be a factor of unsuitability when he has remained disciplinary free for over twelve (12) years. Mr. Asbury's institutional behavior clearly indicates the kind of "enhanced ability to function within the law upon release" that this section contemplates.

The Board had before it all of the above evidence, plus the conclusions of the highly-experienced CDC psychologist, Dr. Joe Reed. After extensive examination of Mr. Asbury and the records, Dr. Reed went on to explain the issues that should have been most significant to the Board:

> [Mr. Asbury] *admits responsibility* for the death of the victim. ... He does appear to *understand the relationship of abusing drugs, including alcohol, with violent behavior and poor judgment.* ... Inmate Asbury does appear to *regret the death of the victim*.

> His *risk for violent behavior* within a controlled setting is *considered to be below average* relative to his level II inmate population.

> Results from the HCR-20 indicate a *low risk of future violence for this inmate* with (sic.) a controlled setting relative to other inmates, and by extension, a *low risk of future violence in the community setting* relative to other inmates. Results from the Hare Psychopathy Checklist, Short Version, *do not indicate the presence of any sociopathy*.

> If released to the community, clinically assessed, his *risk for future violence potential appears to be no greater than the average citizen in the community*, if he remains substance-free.

> This inmate is *competent and responsible for his behavior.* Exh. C pp. 340-341, emphasis added.

This CDC appointed psychologist, who had examined Mr. Asbury on three (3) occasions, drafted a report very supportive of parole. Yet, the Board choose to ignore the relevant portions of these reports by drawing attention to the insignificant discrepancies they included related to college course units received and a misunderstanding over which certificates were received.[32]

The Board's denial of parole in this case simply cannot be deemed as anything but arbitrary and pro forma. As the court in *Ramirez* stated, the "Board's readiness to make a finding so at odds with the record supports [Mr. Asbury's] claim that his parole hearing was a sham. It is not surprising that the trial court regarded the Board's findings with deep suspicion." *Ramirez*, 94 Cal.

---

[32] Petitioner requests this Court note the fact that Petitioner notified Dr. Reed of the errors concerning his certification during his 2005 evaluation. These corrections are in Dr. Reed's addendum report. Exh. C p. 343.

App. 4th at 571. Likewise, here, the Board's decision should be viewed with "deep suspicion" since all of the evidence directly contradicts the Board's findings and they are "so at odds with the record." *Id.*

In boilerplate fashion, the Board purported to "commend" Mr. Asbury for all of his hard work and positive change, yet denying him a parole release date, finding the positive factors do not outweigh the immutable factors relied upon to deny parole:

> "We want to commend you for the fact that you've not had a 115 for over 10 years, the fact that you have not had a 128(a) counseling Chrono since 1988, that you did complete some 27 units of college work, had your GED, that you completed small engine repair and have spent time in computer refurbishing, that you did participate, at some point, in AA and have ongoing participation in hobby craft. But these positive aspects of your behavior do not outweigh the factors of unsuitability." Exh. B pp. 333-334.

It is apparent that while the Board mouthed consideration of the circumstances tending to show Mr. Asbury's suitability for parole, they did not give actual, much less adequate, consideration to those factors. See *In re Rosenkrantz*, 80 Cal.App.4th 409, 427 (2000); see also *In re Ramirez*, 94 Cal.App.4th 549, 114 Cal.Rptr.2d 381 (2001).) The Board failed to meaningfully consider any of the suitability factors and failed to provide any real or reliable evidence of unsuitability. The reports of the State's own experts hired to evaluate Mr. Asbury's potential for violence if released provide *no evidence* that he poses a current unreasonable threat to the public.

In another mockery of due process and a showing of just how above the law the Board thinks it is, despite Mr. Asbury's continued participation in Alcoholics Anonymous, the Panel recommended to him that "when it is available to you that you participate in self-help." Exh. B p. 334. In actuality, there are no programs of that nature available for Petitioner now, and his place on the waitlist for Alcoholics Anonymous has been documented. As the CDC continues to close down practically all vocational and self-help programs, this makes it impossible for Mr. Asbury to fulfill the requirements set forth by the Board. Such impossible demands, put upon Petitioner as a condition to obtain his freedom, violate the most basic concept of due process.

In sum, Mr. Asbury was denied a parole release date at his eighth parole consideration hearing based on one primary, *immutable* factor that will never change, i.e. the fact that he committed the offense. Review of the record reveals that the reasons cited by the Board to support its denial of parole are legally inadequate, and the Board gave insufficient consideration

to the evidence indicating Mr. Asbury's suitability for parole. The Board's denial of parole in this case simply cannot be deemed as anything but arbitrary and pro forma. As the court in *Ramirez* stated, the "Board's readiness to make a finding so at odds with the record supports [Mr. Asbury's] claim that *his parole hearing was a sham.*" *Ramirez*, 94 Cal. App. 4th at 571, emphasis added.

The facts speak for themselves. The Corrections industry's purpose is to protect the public by securely incarcerating dangerous offenders and offering rehabilitative programs that will one day allow those offenders, or at least the majority of them ("normally") to be released to become a productive and non-threatening part of society. At such time as the offender has reformed to the point that he no longer poses a "current" threat to the public, a release date must be set, and that release date is determined by applying the period of incarceration that has been prescribed for the circumstances of the particularized offense. See *Penal Code* §3041; *In re Ramirez, supra, Biggs v. Terhune, supra, McQuillion I, supra.*

In the case at bar, the *only* factors the Board could point to support its denial of parole were the immutable facts that Mr. Asbury indeed committed this crime. There was not one shred of evidence that Mr. Asbury currently poses a threat to the public. This is precisely the kind of circumstance condemned by the courts in *In re Ramirez, supra, Biggs v. Terhune, supra, McQuillion I, supra,* and *In re Rosenkrantz, supra,* 80 Cal.App.4th 409. A review of the evidence in this case results in the inescapable conclusion that the Board abused its discretion when it refused to comply with the dictates of *Penal Code* §3041 and set a parole release date and purported to support that decision by pointing to factors that will and can never change and which provide no evidence of any "current" threat by the Petitioner.

It is in the face of all the evidence, including the support of family and friends, positive psychiatric evaluations, marketable work skills, current employment offers, and a lack of unsuitability factors that Mr. Asbury was denied a future parole release date. The *only* fact the Board pointed to in support of its denial was the immutable fact that Mr. Asbury committed this crime, a fact for which the Legislature has said he should be entitled to a release date. As stated previously, the reliance on the offense itself, absent other evidence indicating a current threat, is simply irrational. See *Little v. Hadden*, 504 F.Supp. 558, 562 (1980), ["It is simply irrational for seriousness of the offense to be used first to determine the appropriate [matrix] period [to be served] and then to be used again as the stated reason for confining a person beyond that guideline.' [Citations.]"].) This is precisely the kind of circumstance condemned by the courts in *In re Ramirez, supra, Biggs v. Terhune, supra, McQuillion I, supra,* and *In re Rosenkrantz,*

56

*supra,* 80 Cal.App.4th 409 [2000].

The last issue to be addressed in determining the release of a prisoner is the fixing of the term proportionate to the circumstances of the case. *Cal. Code Regs.*, tit. 15 §2403(d) provides a matrix term of 19-20-21 years, less post-conviction credits for the circumstances of Mr. Asbury's offense. (See §2403(d) Matrix II-C ([II] Prisoner had no Personal Relationship with the Victim) and [C] Death resulted from Severe Trauma).) It was the Board's duty to set a term and set a future release date within the guidelines of that Matrix.    Petitioner had 2934 days total pre prison credit, or approximately 98 months. App. A, Exh. A p. 3. Even applying the high end of the matrix, 252 months, taking into consideration his pre-prison credit, Petitioner should have served no more than 153 months, or 12 years 9 months, from reception. (252 months minus his pre-prison credits). Petitioner has served the equivalent of one month shy of forty (40) years (23 years 10 months from his 6/13/84 reception to now, plus his 8 years and 2 months pre-prison credits and 7 years 11 months post-commitment credit). Even as of the 2005 Board hearing, Petitioner had served over *15 years* above his designated matrix, and is now 19 years over. It was not within the Board's discretion, however, to fail to set any term or release date whatsoever. With post conviction credit, *Mr. Asbury has now served over thirty six (36) years in prison for a parole eligible second degree murder*.

Thus, the Board violated Petitioner's due process rights when it failed to set a release date consistent with the term prescribed for the circumstances of Mr. Asbury's actions. Should Mr. Asbury exhibit behavior at any time in the future that indicates he would pose a threat if released, the Board would always have the authority to delay or rescind his parole. Absent such aberrant behavior, or other evidence indicating an unreasonable threat of violence if released, the Board is without authority to keep Mr. Asbury incarcerated beyond the term prescribed by law, i.e. 19-20-21 years less post-conviction credits.

V.    **THE BOARD'S RULING IS CONTRARY TO CLEARLY ESTABLISHED SUPREME COURT LAW AS IT RELIES ON UNCONSTITIONALLY VAGUE LANGUAGE.**

The Board denied Mr. Asbury parole at his January 5, 2005 hearing, describing the crime as "one of the more brutal crimes," "[showing] lack of regard for the life and suffering of another," and "carried out in a cruel fashion on a vulnerable victim." Exh. B, p. 329. However, the Board's characterization of the crime to support the denial of parole, using wholly vague and

amorphous terms, is contrary to clearly established Supreme Court law and violative of fundamental due process.[33]

A statute (or regulation) is void for vagueness "if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, or if it invites arbitrary and discriminatory enforcement." *United States v. Doremus*, 888 F.2d 630, 634 (9th Cir. 1989). In addressing a vagueness challenge, the first question is "whether to scrutinize the statute for intolerable vagueness on its face or whether to do so only as the statute is applied in a particular case." *Schwartzmiller v. Gardner* (9th Cir. 1984) 752 F.2d 1341, 1346. As will be discussed herein, the factors set forth in *Cal. Code Regs.*, tit. 15, § 2402(c) used by the Board to determine whether the crime was committed in an especially heinous, atrocious or cruel manner, as applied, are purely subjective, and are unconstitutionally vague. As such, these factors are not easily understood or explained, and thus, Mr. Asbury did not have notice that they would apply to him.[34]

Here, the Board found did not describe this crime with the typical language including "callous" and "calculated" pursuant to *Cal. Code Regs.*, tit. 15, § (c)(1)(B)&(D). Instead, they Board used even more vague and undefined language, describing the crime as "one of the more brutal crimes...carried out in a cruel fashion on a vulnerable victim." Exh. B p. 329. The California Supreme Court in two separate opinions discussed the standards the Board may use in finding a prisoner unsuitable for parole based on the circumstances of his commitment offense. See *Rosenkrantz V, supra*, Cal.4th 616; *In re Dannenberg, supra*, 34 Cal.4th 1061. The Court in

---

[33] What the record does show is that the Board continuously falls back on the immutable and unchanging facts of the crime. The Board has ignored the law in this regard. (See *Biggs v. Terhune, supra*, 334 F.3d at 916-917 [repeated reliance on unchanging facts in the face of uncontradicted evidence of rehabilitation violates due process]). Furthermore, Petitioner's participation in the crime is not sufficiently egregious factually when evaluated in light of the more recent decisions in state cases such as *In re Ernest Smith* (2003) 114 Cal.App.4th 343 [unchanging history of drug and spousal abuse not sufficient to deny parole, and while shooting victim three times in the head is "callous," it is not necessarily "particularly egregious" compared to similar life crimes], *In re Mark Smith* (2003) 109 Cal.App.4th 489 (2003) [crime not egregious despite facts that victim was shot twice by inmate, before inmate ordered copart to drown the victim], *In re Scott, supra*, 119 Cal.App.4th at 890-892 [crime is not particularly egregious compared to other murder despite facts of shooting victim in the presence of child], and *McQuillion I, supra* [double murder, with father-son proprietors tied up and executed during culmination of spree of robberies, not sufficiently egregious to justify rescission]. The holdings of these cases, compared with the "findings" of the Board in this case, clearly demonstrate the arbitrariness. (Compare with *In re Van Houten supra*, 116 Cal.App.4th 339 [the existence of death penalty eligible special circumstances in Van Houten's particular offense demonstrates what is sufficiently egregious to provide " 'some evidence' that the horrible [violence] potential may still be within her."].)

[34] The California Supreme Court has determined in cases involving the death penalty or life without the possibility of parole, the terms "especially heinous, atrocious, or cruel, manifesting exceptional depravity" are unconstitutionally vague and violative of fundamental due process. *The Superior Court of Santa Clara v. Engert* (1982) 31 Cal.3d 797, 805.

*Rosenkrantz V* held that "the nature of the prisoner's offense, alone, *can* constitute a sufficient basis for denying parole." (*Rosenkrantz V, supra,* 29 Cal.4th at 682 (emphasis added).) The *Rosenkrantz V* decision employed conditional language that the offense can constitute such a basis, if the crime could reasonably be considered *more* aggravated or violent than the minimum necessary to sustain a conviction for that offense.[35] (*Id.* at 683, (emphasis added).) Although the *Rosenkrantz V* language is itself unconstitutionally vague, the California Supreme Court, in that decision, did state a clear directive that sole reliance on the commitment offense will violate the prisoners' due process rights pursuant to *Penal Code* § 3041(a) in situations where the offense "could [not] be considered *more* aggravated or violent than the minimum necessary to sustain a conviction for that offense." *Rosenkrantz V,* 29 Cal.4th at 683. However, the subsequent *Dannenberg* decision, rendered by the California Supreme Court, further muddied the waters by changing the standard set forth in *Rosenkrantz V,* allowing the Board to deny parole based on the commitment offense if the inmate's crime was "more than minimally necessary to convict him of the offense for which he is confined." *In re Dannenberg, supra,* 34 Cal.4th at 1095. This fundamentally altered the standard by removing the focus from determining whether the crime was "especially heinous, atrocious and cruel" so long as there is simply more evidence than "minimally necessary to convict.

As noted by the dissent in *Dannenberg,* this standard is ***completely*** unreviewable. *Id.* at 1102, (emphasis added). The result is a definition, or standard, that like the Greek god Proteus, constantly changes shapes, is never consistent and is incapable of being defined or pinned down. What may be callous or heinous, under this standard, to one Board member may not be such to another. As presented in the *Cal. Code Regs.,* tit. 15 § 2402, and subsequently defined by the Courts in both *Rosenkrantz V* and *Dannenberg,* every murder could fit into the category of "more than minimally necessary to convict" by virtue of the fact that the inmate was convicted and thus the evidence is presumptively greater than the "minimum necessary to convict." This application is wholly arbitrary and depends on the subjective, personal opinions and whims of the Board members. As such, the Board has fully exploited and abused this carte blanche language to repeatedly deny parole based *solely* on the nature of the commitment offense, by deeming it exceptionally "heinous, atrocious, cruel, or dispassionate." The current structure permits a conclusion that can easily be reached by those Board members who want to claim that the facts

---

[35] As the dissent in *Dannenberg* pointed out, this standard is completely unreviewable. *Dannenberg, supra,* 34 Cal.4th at 1102.

of any murder are more than those minimally necessary for conviction. Since the *Dannenberg* Court dispensed with the requirement that the offense be compared to other murders, the standard can be said to fit any murder, including accomplice liability, DUI based car accident, non-intentional (implied malice) killings, and the like.

As explained by the United States Supreme Court, there is nothing in the language and descriptions used that standing alone "implies any inherent restraint on the arbitrary and capricious infliction" of the denial of parole suitability. *Godfrey v. State of Georgia* 446 U.S. 420, 428 (1980). The Court explained that a "person of ordinary sensibility could fairly characterize almost every murder as [exceptionally heinous, atrocious, cruel or callous]." *Id.* at 429. The Court has determined that for death penalty purposes, the terms "especially heinous, atrocious or cruel" are unconstitutionally vague. *Maynard v. Cartwright*, 486 U.S. 356, 361-364 (1989). The Court has repeatedly found that as applied to death penalty cases, the terms such as "heinous" and "atrocious" could be used by any reasonable person to characterize every murder so as to fall into those categories. *Shell v. Mississippi*, 498 U.S. 1, 3 (1990); *Maynard v. Cartwright, supra*, 486 U.S. at 363; *Godfrey v. Georgia, supra*, U.S. 420, 428-429.[36]

Here, the Board's decision was based on the claim that Petitioner's crime was brutal, showed lack of regard for the life and suffering of another, and was carried out in a cruel fashion. Exh. B, p. 329. However, as explained by the United States Supreme Court, these terms do not possess any inherent restraint to prevent any arbitrary or capricious application. *Godfrey v. State of Georgia, supra*, 446 U.S. at 428. Furthermore, by the California Supreme Court's own admission, the terms used are unconstitutionally vague. *Superior Court of Santa Clara County v. Engert*, 31 Cal.3d 797, 805 (1982).[37] The intervening California Supreme Court's decision in *Dannenberg* further confuses the situation by stating that the crime need only be above the minimum necessary for conviction. *In re Dannenberg, supra*, 34 Cal.4th at 1071. It is Petitioner's position that the Board relied on *Dannenberg's* unconstitutionally vague standard in denying him parole. As such, the Board's determination that Mr. Asbury's crime was

---

[36] As stated supra, the California Supreme Court has held that these terms are unconstitutionally vague as applied to death penalty and life without the possibility of parole (LWOP) cases. However, as will be discussed more fully infra, California's Executive branch has implemented an illegal no parole policy, thereby converting Petitioner's sentence into LWOP. Therefore, as applied, these terms are unconstitutionally vague.
[37] The decision in *Engert* applied to death penalty and LWOP cases. However, this creates a loop-hole in which if not corrected, the Board and courts would be allowed to apply unconstitutionally vague terms to term to life sentences, in order to effectively turn the sentence into an LWOP by repeatedly using the crime to deny parole.

exceedingly brutal, in order to deny a finding of suitability, was contrary to clearly established Supreme Court law.

###### VI. THE FAILURE OF THE PROSECUTION TO REQUEST THAT THE TRIAL COURT MAKE SPECIAL FINDING REGARDING THE ASPECTS OF THE CRIME PRECLUDES THOSE FINDINGS FROM NOW BEING USED TO JUSTIFY DEPARTING FROM THE "SHALL NORMALLY" FORMULATION OF PENAL CODE §3041.

In three (3) recent United States Supreme Court decisions, our High Court has stated that the constitutional right to due process, and the right to a jury trial, requires that each and every fact used to increase the penalty for a crime *must be alleged and found true by the trier of fact*, be it by jury or a defendant's own admission of facts in a plea of guilty. *Apprendi v. New Jersey,* 530 U.S. 466 (2000); *Blakely v. Washington,* 542 U.S. 296 (2004); *Cunningham v. California,* -- U.S.--, 127 S.Ct. 856 (2007).) As will be discussed herein, these principles bar the Board from making findings that take the Mr. Asbury's case outside the normal sentencing scheme, here, the matrix of uniform terms, as the Board's "findings" that support the denial of parole suitability act as both a literal and effective change in the crime for which Mr. Asbury was convicted. Such a change is a constructive amendment and is prejudicial per se. *Jones v. Smith,* 231 F.3d 1227, 1232-33 (9th Cir. 2001).)[38] As stated by the U.S. Supreme Court:

> "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi, supra,* 530 U.S. at 490.

If a person is convicted at trial, the facts are determined by the jury, and the defendant is entitled to rely on those determinations as defining the nature of the crime. What is occurring repeatedly at Mr. Asbury's Board hearings is that, despite his lower level of conviction, the Board is relying on unsubstantiated allegations to elevate his crime to the equivalent of a first degree murder. This negates the jury's determinations, including the express acquittal of that charge, because he is now being punished as if the crime were of a higher degree. At the time of the hearing at issue, Mr. Asbury was over fifteen (15) years beyond his minimum eligible parole

---

[38] As the Supreme Court indicated in *Stirone v. United States,* 361 U.S. 212, 218 (1960), where a defendant is convicted of a crime and where the grand jury never charges the defendant with an essential element of the crime, a constructive amendment has occurred and reversal is warranted. Since the ruling in *Apprendi, supra,* the Court has made it clear that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. As such, *Apprendi* expands the range of discrepancies that will amount to constructive amendments.

date, and with credits, had not only surpassed the term for even the most egregious of second degree murders, but was already well beyond the top of the matrix of terms for first degree murder. The findings relied on by the Board to support this result are being made without the benefit of any factual determinations by either a jury or a court at plea.

Any argument by Respondents that the denial of parole does not increase Mr. Asbury's sentence beyond the statutory maximum of life and thus, does not violate the *Apprendi-Blakely-Cunningham* rule, must be rejected. In *Blakely*, the trial judge had sentenced the defendant to 37 months higher than the presumptive, or normal, term, based on a the sentencing judge's finding of an aggravating circumstance, but was still under the ten (10) year maximum term under the Washington statute. In response to the state's argument that there was no *Apprendi* violation since the ten (10) year maximum was not exceeded, Justice Scalia cleared this point up, stating, 'the statutory maximum' for *Apprendi* purposes is the maximum sentence  a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the Defendant." *Blakely v. Washington, supra,* 542 U.S. 296, at 36.

Despite this clear ruling, in these cases, the Board will typically argue that fact finding is allowed under *Blakely* in indeterminate sentencing cases, and in any event, the term range extends to life, so the fact finding will never cause the term to exceed the statutory maximum. This of course ignores Justice Scalia's contrary pronouncements in *Blakely* regarding what constitutes the statutory maximum for *Apprendi* purposes. Petitioner notes that it is not the life term that is exceeded by the Board's actions, but the normal or presumptive range of sentence that must apply in the absence of certain special findings. This is precisely what Justice Scalia (see the previous discussion) cleared up in establishing what constitutes the relevant statutory maximum under *Apprendi*, when he set the limit in *Blakely* by stating, "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the Defendant." *Blakely, supra,* 542 U.S. at 306. In *Blakely*, the maximum sentence was ten (10) years, but the presumptive or normal range was up to 53 months. Thus, although the sentence was more than two (2) years below the statutory maximum, because it exceeded the presumptive range, it was held to violate the rule of *Apprendi*.

Recently, in *Cunningham*, the United States Supreme Court specifically addressed California's Determinate Sentencing Law (DSL). The DSL gave trial judges the authority to "find facts that expose a defendant to an elevated 'upper term' sentence." *Cunningham, supra,*

___ U.S. ___, 127 S.Ct. at 860. These facts were found by a preponderance of the evidence, rather than proof beyond a reasonable doubt. (*Id.*) Additionally, under the DSL, the sentencing court was supposed to give the middle term unless it found elements in aggravation or mitigation beyond the charged offense. (*Id.* at 862.) The Supreme Court, therefore, concluded "the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum." *Id.* at 868, citing *Blakely, supra*, 542 U.S. at 303. The Court specifically rejected the California Supreme Court's conclusion, in *People v. Black*, 35 Cal.4[th] 1238 (2005), that the upper term was the statutory maximum. *Cunningham, supra*, at 868-869. Thus, because the middle term is the presumptively applied sentence, it constitutes the "statutory maximum" and since the DSL improperly authorized the judge, not the jury, to find facts permitting the upper term, the Supreme Court concluded Cunningham's Sixth Amendment right to a jury trial was violated because he was given the sixteen (16) year upper term based upon facts found by the judge. (*Id.* at 860, 871.)

Since *Blakely* came down, two (2) decisions of the California Supreme Court have defined aspects of the California sentencing scheme, as applicable to indeterminate sentences, which mandate the application of the *Apprendi-Blakely-Cunningham* rule when findings are made by the Board that remove the case from the matrix of proportional terms set up under *Cal. Code Regs.*, tit. 15, §2403. This is irrespective of the discussion in *Blakely* about how judicial fact-finding is ***ordinarily*** appropriate in indeterminate cases, as it does not affect a right to a certain sentence. As will be seen, under California's scheme, the fact finding here does affect a right to a set term under the matrix.

First, in the case of *In re Dannenberg*, 34 Cal.4[th] 1061 (2005), the California Supreme Court made it clear that the public safety exception in *Pen. Code* §3041(b) is just that, an exception to the general rule of *Pen. Code* §3041 that an inmate "shall normally" be found suitable. See *Dannenberg, supra*, 34 Cal.4[th] at 1080. Absent findings that fit the crime within that exception, the Board is required to follow the "shall normally" formulation and find the inmate suitable. If the Board does not find the case to fit under the public safety exception of §3041(b), the Court concluded in *Dannenberg* that the use of the matrix is mandatory. *Id.* at 1078. Thus, the matrix constitutes the "normal" or "presumptive" sentencing range for *Apprendi-Blakely-Cunningham* purposes, despite the fact that the overall maximum sentence of life is not exceeded. The second important decision by the California Supreme Court in this area is the case of *In re Roberts*, 36 Cal.4[th] 575, at 589-590 (2005), where the Court ruled that parole

is an integral part of the overall process of sentencing. See also *In re Sena,* 94 Cal.App.4th 836, at 839 (2002). Under California law, the sentencing process is not complete until the term is set and the inmate released. *Roberts, supra,* 36 Cal. 4th at 589-590; *Sena, supra,* 94 Cal.App.4th at 839. As such, the Board is an entity that wears two (2) hats, serving as part of the executive branch, but discharging certain judicial functions as an extension of the sentencing process. This was precisely the conclusion of the court of appeal in the case of *In re Hogan,* 187 Cal.App.3d 819, 824 (1986) ["The Board, in setting a release date for an indeterminate sentence, performs the same function as does the trial court in ordering a determinate sentence – it fixes a term of definite duration.].

The effect of these cases is to hold that the Board is conducting a sentencing hearing when considering parole, still discharging part of the sentencing function, and acting in the place of the trial court in determining parole suitability and\or setting a term. Thus, the Board has a duty to leave the case within the presumptive range of the matrix, unless facts taking the case outside the matrix have been properly found. When the Board engages in fact finding and makes a determination that the "public safety" exception of §3041(b) applies, it is using those facts it has determined to take the case outside the normal or presumptive range for *Apprendi-Blakely-Cunningham* purposes. Thus, under California law, the fact-finding does impact a right to a term under the matrix. This is clearly the type of judicial fact finding beyond the jury verdict that Justice Scalia was addressing in *Blakely,* which was found to contravene the right to a jury trial. As such, it violates clearly established federal law by infringing on the constitutional right to due process and to a jury trial.

Because this violation by the Board involves misinterpretation of statutory law and the violation of due process, a non-deferential *de novo* review standard applies and this court is not constrained to the "some evidence" standard. *Ghirardo v. Antonioli,* 8 Cal.4th 791, 800 (1994) [questions of law are reviewed *de novo*]; *Brown v. Poole,* 337 F.3d 1155 (9th Cir. 2003).

//

//

//

1
2
3
### *CONCLUSION*
4        Based on the foregoing, it is clear that Mr. Asbury is both eligible and suitable for parole,
5  and the Board's failure to set a future release date at his eighth hearing violated both the law (*Penal*
6  *Code* §3041(a)) and Mr. Asbury's constitutional right to due process.   Thus, it is respectfully
7  requested that this Court issue a writ of habeas corpus, directing the Board to set aside its decision,
8  and to conduct a new hearing at which the crime may not be considered as the support for a finding
9  of unsuitability. Alternatively, it is respectfully requested that if the denial is upheld, that the Court
10  still issue the writ, but direct that the one year denial be set aside, and a new hearing occur within 45
   days.

Dated:___August 6, 2008_____          Respectfully submitted,

                                        LAW OFFICE OF PICONE & DEFILIPPIS


                                        By:_____

                                        STEVE M. DEFILIPPIS
                                        Attorneys for Petitioner,
                                        EDMUND ASBURY

65